**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **MURPHY SHIPPING & COMMERCIAL** | § | |
| **SERVICES, INC.  DBA** | § | |
| **MURPHY GLOBAL LOGISTICS** | § | **Case No. _____** |
| | § | |
| **DEBTOR** | | |

## DEBTOR'S PLAN AND DISCLOSURE STATEMENT

Dated: August 12, 2020

**WILEY LAW GROUP, PLLC**

Kevin S. Wiley, Sr.
Texas Bar No.: 21470700
Fed. I.D. No.
325 N. St. Paul Street, Suite 2250
Dallas, Texas 78201
T: (214) 537-9572
F: (972) 498-1117
kwiley@wileylawgroup.com
*Counsel for Debtor*

# TABLE OF CONTENTS

**1. Defined Terms and Rules of Interpretation** ...........................................................................**3**
a. Rules of Interpretation and Construction........................................................................3
b. Defined Terms....................................................................................................................4

**2. Background**.........................................................................................................................**10**
a. Overview of the Debtor ....................................................................................................10
ii. Services..............................................................................................................................12
iii.  Market and Customers....................................................................................................13
b. Events Leading to the Chapter 11 Filings.......................................................................14

**3. Disclosures** .......................................................................................................................**15**
a. Legal Structure and Ownership.......................................................................................15
b. Current and Historical Conditions..................................................................................15
c. Certain Federal Income Tax Consequences....................................................................15
d. Alternate Combined Plan and Disclosure Statement ....................................................16
e. Best Interests Test ............................................................................................................16
f. Liquidation Analysis ........................................................................................................18
g. Feasibility..........................................................................................................................19
h. Acceptance by Impaired Classes .....................................................................................19
i. Confirmation Without Acceptance by All Impaired Classes ..........................................20
j. Sources of Information Provided .....................................................................................21
k. Accounting Methodology .................................................................................................21
l. Condition and Performance of Debtor While in Chapter 11 ...........................................21
m.    Future Management of Debtor & Compensation of Management and Insiders .........22
n. Details Regarding the Plan's Funding & Capital Needs .................................................22
o. Assessment of the Collectability of Accounts Receivable .............................................23
p. Relationship of Debtor with Affiliates ............................................................................23
q. Avoidable Transfers & Causes of Action.........................................................................23

**4. Risk Factors** ....................................................................................................................**25**
a. Bankruptcy Law Considerations .....................................................................................26
1. Parties in Interest May Object to the Plan's Classification of Claims and Interests........26
2. Voting Requirements Deleted.........................................................................................26
3. The Debtor's Ability Able to Secure Confirmation of the Plan Under SBRA Have Been Modified
    and Greatly Relaxed .......................................................................................................26
4. Nonconsensual Confirmation..........................................................................................28
5. Continued Risk After Confirmation ................................................................................28
6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code .......29
7. Debtor May Object to the Amount or Classification of a Claim .....................................29
8. Risks of Non-Occurrence of the Effective Date .............................................................29
9. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan...................30
b. The Reorganized Debtor May Not Be Able to Achieve their Projected Financial Results...............30
c. Risks Related to the Debtors and the Reorganized Debtor's Businesses .......................................31

ii

1. The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness................................................................................31
2. The Reorganized Debtor Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases.......................................................................................31
3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtor' Business .................32
4. Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance ..33
5. Debtor Has Liquidity Needs .................................................................................33
6. The Debtor Operates in a Highly Competitive Industry................................................34
7. The Reorganized Debtor May be Adversely Affected by Potential Litigation .............................34
8. The Loss of Employees Could Adversely Affect the Debtor' Operations..................................35
9. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's Financial Condition and Results of Operations ...........................................................35

**5. Summary of the Debtor' Assets and Treatment of Claims and Equity Interests....................35**
a. Summary of Assets.......................................................................................35
b. Summary of the Plan of Reorganization................................................................36
c. Administrative and Priority Claims....................................................................36
d. Summary of Treatment of Claims and Equity Interests ...............................................38
i. Classification of Claims and Equity Interests.......................................................38
ii. Treatment of Claims and Equity Interests...........................................................39
1. Class 1: Secured Claim.................................................................................39
2. Class 2: Secured Claim.................................................................................39
3. Class 3: Unsecured Creditors of Professionals.......................................................39
4. Class 4: General Unsecured Claims of Derivative Claimants .........................................40
5. Class 5:  Equity Interest...............................................................................40

**6. Executory Contracts and Leases.........................................................................41**

**7. Claims Objections.........................................................................................42**

**8. Confirmation Procedure .................................................................................42**
a. Hearing....................................................................................................42
b. Procedure for Objecting..................................................................................42
c. Requirements for Confirmation..........................................................................43
d. Classification of Claims and Equity Interests.........................................................43
e. Impaired Claims or Equity Interests....................................................................44
f. Eligibility to Vote on the Plan...........................................................................44
g. Voting Deadline ...........................................................................................44
h. Acceptance of the Plan ..................................................................................44

**9. Provisions Governing Distributions....................................................................45**
a. Method of Payment.......................................................................................45
b. Distribution Agent.......................................................................................45
c. Distributions..............................................................................................45
d. Rule for Disputed Claims................................................................................46
e. Undeliverable Distributions and Unclaimed Property ...............................................46

**10. Effect of Confirmation of the Plan**................................................................**47**

**11. United States Trustee Fees**..........................................................................**47**

**12. Miscellaneous Provisions**.............................................................................**48**
a. Binding Effect ................................................................................................48
b. Headings .......................................................................................................48
c. Termination of Injunctions or Stays...............................................................48
d. Amendment or Modification of the Plan ........................................................49
e. Severability....................................................................................................49
f. Revocation or Withdrawal of the Combined Plan and Disclosure Statement ..................49
g. Exhibits and Scheduled .................................................................................50
h. No Admissions ..............................................................................................50
i. Successors and Assigns ................................................................................50
j. Implementation ..............................................................................................50
k. Inconsistency.................................................................................................50

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS, THE DEBTOR' COMBINED PLAN AND DISCLOSURE STATEMENT. THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS SUBSTANTIALLY COMPILED FROM THE DEBTOR'S BOOKS AND RECORDS TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL

OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **MURPHY SHIPPING & COMMERCIAL** | § | |
| **SERVICES, INC.  DBA** | § | |
| **MURPHY GLOBAL LOGISTICS** | § | **Case No. _____** |
| | § | |
| **DEBTOR** | § | |

<u>**DEBTOR'S PLAN AND DISCLOSURE STATEMENT**</u>

On August 14, 2020, (the "Petition Date") a Murphy Shipping & Commercial Services, Inc., DBA Murphy Global Logistics, (the "Debtor") filed its petition for relief under Chapter 11, title 11.

This is Debtor's Combined Plan and Disclosure Statement (the "Plan") filed that same date. The Debtor is the proponent of this Plan within the meaning of Section 1129 of the Bankruptcy Code.  Under Subdivision V of  Chapter 11, title 11, this disclosure statement is provided at the option of the Debtor for additional information to its creditors, that while not required under that statute, will assist the creditors in determining whether to consent or dissent from the Plan. Whether creditors do assent or dissent, as discussed, will not, however, be determinative of whether the Plan may yet be confirmed over dissenting creditors.

**1. Defined Terms and Rules of Interpretation**

    **a.   Rules of Interpretation and Construction**

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender, (ii) any reference herein to a contract, instrument, release, indenture, or other agreement or

document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) any reference to any existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references to "sections" are references to or sections hereof in the Debtor's Plan; (v) the words "herein," "hereof" and "hereto" refer to the Debtor Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to sections or subsections are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation hereof; (vii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (viii) any term used in capitalized form herein that is not otherwise defined shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of the Bankruptcy Rule 9006(a) shall apply in the computing any period of time prescribed or allowed hereby.

### b. Defined Terms

Unless the context otherwise requires, the following capitalized terms used in this Plan shall have the meanings set fourth bellow:

1.     "*Administrative Expense Claim*" means a Claim for costs and expenses of administration of the estate, including: (a) the actual and necessary cost and expenses incurred after each Debtor's respective Petition Date and through the Effective Date of presenting the Estates and operating the business of the Debtor, (b) professional fee Claims, and (c) statutory see Claims.

2.     "Affiliate" means, with respect to any Entity, "affiliate" as defined in section 101 (2) of the Bankruptcy Code.

3.     "*Allowed*" means, with reference to any Claim (i) any Claim against the Debtor which has been

listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (ii) any Claim or Equity Interest arising on or before the Effective Date for which a Proof of Claim has been timely filed before the applicable bar date (x) as to which no objection to allowance has been interposed or (y) as to which any objection has been determined by a final order to the extent such objection is determined in favor of the respective Holder, (iii) any Claim or Equity Interest as to which the liability of the Debtor and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court and for which a Proof of Claim has been timely Filed before the applicable bar date, or (iv) any Claim expressly Allowed hereunder or pursuant to an Order of the Bankruptcy Court; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, punitive damages or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date. Unless otherwise provided in an Order of the Bankruptcy Court, for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtor may hold or assert against the Holder thereof, to the extent such claim may be set off pursuant to sections 502(d) or 553 of the Bankruptcy Code.

4.      "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been

commenced as of the Effective Date to prosecute such Claims or Causes of Action.

5.      "*Ballot*" means the ballot forms distributed with the Plan to Holders of Impaired Claims entitled to vote in connection with the solicitation of acceptances of the Plan.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101- 1532 and Chapter V thereof.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over these Chapter 11 Cases.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

9.      "*Books and Records*" means those books, records and financial systems of the Debtor, including any and all documents and any and all computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtor maintained by or in the possession of third parties, wherever located.

10.      "*Business Day*" means any day, other than a Saturday, Sunday or a "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

11.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

12.      "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtor, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date, or during the course of the Chapter 11 Cases through the Effective Date.

13.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for the Debtor under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14.    "*Claim*" means any claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

15.    "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

16.    "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the Docket of the Chapter 11 Cases.

17.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases.

18.    "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation Debtor' plan of reorganization in the Combined Plan 2and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

19.    "*Confirmation Order*" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

20.    "*Creditor*" means any Entity that is the Holder of a Claim against either of the Debtor.

21.    "*Debtor*" means the Debtor, in its capacity as a debtor and debtor in possession.

22.    Reserved.

23.    "*Disputed*" means every Claim, or any portion thereof, that has not been Allowed pursuant to the Plan or a final order of the Bankruptcy Court and:

    i.  if a Proof of Claim has been timely filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent, or disputed, or in zero unknown amount, and has not been resolved by written agreement of the parties or a final

Debtor's Combined Plan and Disclosure Statement

order of the Bankruptcy Court;

    ii.  if either (1) a Proof of claim has been timely filed by the applicable bar date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which either Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and orders of the Bankruptcy Court, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a final order;

    iii.  that is the subject of an objection or request for estimation filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved, or overruled by final order of the Bankruptcy Court; or

    iv.  That is otherwise disputed by the Debtor in accordance with the provision of the Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by final order.

24.    "*Distribution*" means any distribution to the Holders of Allowed Claims.

25.    "*Effective Date*" means the first Business Day after the Confirmation Date. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

26.    "*Entity*" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

26.    "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership interest or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and all rights arising with respect thereto that existed immediately before the Effective Date.

27.    "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case

pursuant to section 541 of the Bankruptcy Code.

28.     "*Executory Contract*" means a contract, as it may have been amended, restated or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any, to which one or more of the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

29.     "*Governmental Unit*" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

30.     "*Holder*" means the beneficial holder of a Claim or Equity Interest.

31.     "*Impaired*" means, with reference to any Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

32.     "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against an affiliated Entity.

33.     "*Person*" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

34.     "*Petition Date*" means August 12, 2020, the date on which the Debtor Filed the petition for relief commencing the Chapter 11 Case.

35.     "*Proof of Claim*" means a timely filed proof of Claim filed against the Debtor in the Chapter 11 Case.

36.     "*Reorganized Debtor*" means the Debtor, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

37.     "*Retained Professional*" means an Entity employed in the Chapter 11 Case in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred in the Chapter 11 Case; or for which compensation has been Allowed by an order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

38.     "Ronald R. Johns, Sr. or Mr. Johns" is the deceased founder of the Debtor. The Estate of Mr. Johns is the 60% shareholder of the Debtor.

39.     "*Schedules*" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtor on August12, 2020, and any and all amendments and modifications thereto.

40.     "*Statutory Fees*" means any and all fees payable to the United States Trustee pursuant to section 1930 of the United States Code and any interest thereupon, and any fees payable to the Chapter V Trustee.

41.     "*United States Trustee*" means the United States Trustee for the Southern District of Texas and the Chapter V Trustee appointed by the United States Trustee to administer this case.

## 2. Background

### a.   Overview of the Debtor

#### i. Murphy Global Logistics

Murphy Shipping & Commercial Services (Nigeria) ("Murphy Nigeria") was formed in Lagos in 1975. Further offices opened in Port Harcourt (1977) and Warri (1978). Murphy Nigeria began life as a specialist Customs' Broker, but, because of the demands of Nigeria's oil & gas sector, soon expanded by adding many other services to its repertoire.

Murphy Shipping & Commercial Services, Inc., DBA Murphy Global Logistics, a Texas corporation, the Debtor affiliate of Murphy Nigeria, was founded by Mr. Johns and five investors in 1996 to partner with Murphy Nigeria to act as Murphy Nigeria's U.S. shipping arm. The owners/founders consisted of Mr. Johns, now deceased, as an owner of Murphy Nigeria, and four of Murphy's employees.  The current ownership of the Company is shown on the chart below.

| SHAREHOLDERS | SHARES | % OWNERSHIP |
| --- | --- | --- |

Debtor's Combined Plan and Disclosure Statement

| | | |
|---|---|---|
| DAVID R. JOHNS, EXECUTOR OF RONALD R. JOHNS, SR., DECEASED | 600 | 60% |
| BOLAJI AGBABIAKA | 200 | 20% |
| LINDA WILKINSON | 50 | 5.0% |
| CHARLES ADAMS, EXECUTOR OF THE ESTATE OF JUNE ADAMS | 50 | 5.0% |
| JERALD HARRIS | 50 | 5.0% |
| RANDY YATES, ATTORNEY-IN-FACT FOR SHERRY WINSMANN | 50 | 5.0% |
| | | |
| TOTAL | 1000 | 100.00% |
| | | |

44

Mr. Ronald R. Johns, Sr. now deceased, and wife, Luanne Johns, jointly owned 60% of the Company's shares as community Property. Under the terms of the Ronald R. Johns will, ½ of this interest was conveyed to the Luanne Elizabeth Johns Trust with the sole beneficiary being wife, Luanne Johns. The other ½ was left as the community interest of Luanne Johns. After issuance of letters testamentary, under Texas Estates Code §453.009Mr. David R. Johns, as Executor, has exercised the voting rights of the entire 60% under applicable Texas probate law to administer the Estate under the terms of the will of Mr. Ronald R. Johns, Sr.[1]

---

[1] Texas Estates Code § 453.009. Distribution of Powers Between Personal Representative and Surviving Spouse

(a)  A qualified personal representative of a deceased spouse's estate may administer:

(1)  the separate property of the deceased spouse;

Debtor's Combined Plan and Disclosure Statement

Per Article VII of the Articles of Incorporation, each shareholder is also a member of the Board of Directors.  However, under the terms of a special shareholder meeting, dated November 29, 2018, the sole directors of the Company are Mr.  David R. Johns; Linda Wilkinson, and Jerald Harris. Mr. David R. Johns was elected by these directors  as CEO and President. Subsequent to this meeting, on December 14, 2018, these directors voted that David Johns had the ability to change and remove directors without further board consent. The current directors on the petition date are thus  David Johns, Jerry Rowell, and Jeff Novak. This Board has also delegated the real powers of CEO/President to Mr. Jerry Rowell.

### ii. Services

Murphy offers logistical support for door-to-door, courier, direct airfreight, consolidated airfreight, and ocean freight service to anywhere in the world.

Through its relationship with Murphy Nigeria, Murphy has developed expert knowledge of the Nigerian and Caspian markets, including Azerbaijan and Kazakhstan. Murphy has extensive, "on-the-ground" experience meeting the Nigerian and Caspian requirements for local customs clearance and hazardous materials handling.  In addition, on-site support in these areas can help ensure a seamless transition through customs for drilling and exploration equipment, and all other

---

(2)  the community property that was by law under the management of the deceased spouse during the marriage;  and

(3)  the community property that was by law under the joint control of the spouses during the marriage.

(b)  The surviving spouse, as surviving partner of the marital partnership, is entitled to:

(1)  retain possession and control of the community property that was legally under the sole management of the surviving spouse during the marriage;  and

(2)  exercise over that property any power this chapter authorizes the surviving spouse to exercise if there is no administration pending on the deceased spouse's estate.

(c)  The surviving spouse, by written instrument filed with the clerk, may waive any right to exercise powers as community survivor.   If the surviving spouse files a waiver under this subsection, the deceased spouse's personal representative may administer the entire community estate.

valuable cargo.

Murphy offers comprehensive cargo shipping and freight forwarding services using all modes of transportation. Murphy provides complete logistical support through each phase of the export process, from receiving the material to delivery of the goods to its final destination. Murphy offers door-to-door service from the premises of the shipper to the premises of the consignee, even in some of the most difficult areas of the world where petroleum companies operate.

Murphy operates under various Agency Agreements for services hired from abroad. All agents are held to contract under strict FCPA compliance agreements and auditing. All third- party service providers are vetted per their quality of service, reliability, available lanes, service history, and by costs. Only third -party providers that have high marks passing Murphy's service and reliability requirements are hired.

### iii. Market and Customers.

Historically, about 95% of Murphy's shipments are of oil and gas equipment into Nigeria. The vast majority of Murphy's customers are in the oil and gas business. In the past, Murphy's clients have included Exxon Mobil, Schlumberger, Addax Petroleum, Halliburton, Noble Drilling and others in the oil and gas industry.

After a 10-year increase in oil prices from 1998 to early 2008, oil prices declined sharply through the end of 2008. After recovering to some extent through the middle of 2014, oil prices again plummeted through July 2020 to historic lows, exacerbated by the downturn in business activity occasioned by the Covera-19 Virus Pandemic. This trend has continued, with some modest upward price movement still reflecting the global downturn. During these downturns, some of the major oil and gas companies as well as service companies merged or went out of business. Noble Drilling was Murphy's primary customer until it spun out its offshore division, Paragon Offshore, in 2014. The Company was doing business with Paragon, but Paragon's business was not as large

as Noble's business. Paragon went bankrupt in 2016. The Company's current largest customers are Pacific Drilling and FW Bender. According to the compiled financial statements, as of the fiscal year ended December 31, 2019, the Company had five major customers and sales to each of these customers exceeded 5% of the Company's total sales. The Company's customer base is highly concentrated and is not diversified. The loss of any one customer could further impair the Company's financial results.

During the downturn, many of the Company's customers began using much larger freight forwarders that could offer more favorable pricing, but less personalized service. Thus, markups on freight declined from the range of 15% to 30% to a range of 3% to 5%. The large freight forwarders do not offer the level of personal customer service that small companies like Murphy can offer. The Company expects customers to begin using the smaller freight forwarders again as the oil and gas market stabilizes.

### b.  Events Leading to the Chapter 11 Filings

The decline in oil prices from over $100 per barrel in mid-2014 and down to mid-$30 per barrel in 2020 and remaining well below mid-$30 per barrel to below cost of production  up until the Petition Date significantly affected the demand for Debtor's export/import services, thereby lowering revenue and causing financial strain. With drop in revenue, the Debtor took all feasible steps to substantially reduce the monthly cash losses. The cost reduction activities included reducing employees, relocating to a smaller and cheaper facility, and increased gross margins by decreasing direct cost.

After the death of the founder, Ronald R. Johns, Sr., on February 17, 2018,   the major creditors of the Debtor are insiders that hold contingent, disputed,  and unliquidated potential derivative claims against the Debtor with respect to transfers made by the said Ronald R. Johns, Sr. that were arguably and potentially  personal and thus arguably not for the sole benefit of the

Debtor. The only other debt owed by the Debtor includes professional claims for attorneys, CPA's, consultants and other professionals that have been employed by the Debtor prior to the filing of the petition, and some marginal trade creditors. The Debtor filed this Chapter 11 case with the primary goal of restructuring the outstanding debt represented by the potential derivative claims and professional claims and continuing forward as an ongoing concern.  A secondary goal is to enjoin interference with the orderly liquidation of the estate by harassing lawsuits filed by certain beneficiaries of the estate that challenge David R. Johns authority to act as executor of the estate, and necessarily with that office control the Debtor. A third goal is to cancel debt deemed uncollectable against the estate without creation of ordinary income for the estate.

### 3. Disclosures

#### a.  Legal Structure and Ownership

Debtor is formed under the laws of the State of Texas, with the capital structure aforementioned.

#### b.  Current and Historical Conditions

Debtor's historical and projected financial performance is attached as **Exhibits A, B**, and **C**.  **Exhibit A** reflects Debtor historic financial condition. **Exhibit B** reflects operational results for the period June 2019-June 2020.  **Exhibit C** reflects the Debtor projected financial condition for the next three years. **Exhibit D** reflects Debtor's operational results post filing. This is reserved since the disclosure is being filed on the Petition Date and no operations have commenced post-confirmation on that date. **Exhibit E** reflects a hypothetical liquidation analysis.

#### c.  Certain Federal Income Tax Consequences

The confirmation and execution of this Plan may have tax consequences to Holders of Claims and Equity Interests. Debtor do not offer an opinion as to any federal, state, local or other

tax consequences to holders of claims and equity interests as a result of the confirmation of this Plan. All holders of claims and equity interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Plan. This Plan is not intended, and should not be construed, as legal or tax advice to any creditor, equity interest holder or other party in interest. However, it is clear from existing tax rules that cancellation of any claim, right, or interest, including, but not limited to, cancellation of contingent, disputed and unliquidated claims of the minority shareholders, and/or cancellation of the debt owed by the Estate to the Debtor, both  in response to and in exchange for  treatment under the Plan, result in no ordinary income event to the holder of the debt under 11 U.S.C. §1146 et al. This tax result is a major incentive to the plan process in lieu of other options.

### d. Alternate Combined Plan and Disclosure Statement

If this Plan is not confirmed, the Debtor, or any other party in interest under original Title 11, Chapter 11, could attempt to formulate a different plan. However, only the Debtor has the right to formulate a plan under the Small Business Reorganization Act ("SBRA") under 11 U.S.C. §1189(b)  *Et seq*. This exclusive right serves to avoid additional costs – including, among other amounts, additional professional fees – that would constitute Administrative Expense Claims (subject to allowance) that may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. The Debtor believes that conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code will result in the incurrence of significant additional fees and expenses to the detriment of the Creditors. If Debtor continues to operate, they will have revenue to make payments to creditors in addition to the fixed payments made on the Effective Date Accordingly, the Debtor believes that the Plan enables creditors to realize the best return under the circumstances.

### e. Best Interests Test

Old Section 1129(a)(7) of the Bankruptcy Code required that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. Continued operations will generate revenue by which the Debtor will be able to make additional payments to creditors under the Plan in addition to the fixed payments made on the Effective Date. This test of consent or receipt of not less than liquidation was the "best interest" test.

However, under SBRA, 11 U.S.C. 1191(d), this "best interest" requirement is changed by either consent, or if no consent, the plan proposes all disposable income for 3-5 years be distributed to creditors, or equal to or greater than the equivalent of this amount. The Plan satisfies this requirement by providing for greater than the equivalent to projected net income result over at least three years. The Plan projects little or no disposable net income. Thus the plan substitutes a material payment to creditors from cash on hand.

In this connection, the definition of "disposable income" under SBRA, 11 U.S.C. §1191(d) means income above that reasonably necessary for the payment of expenses for the continuation, preservation or operation of the business. Because of the downturn in the oil industry occasioned primarily by Covid-19 interruption, it will be several years before the Debtor realizes any significant "disposable income". However, the Debtor needs to retain as much working capital as possible to reorganize and weather the downturn. The Debtor thus meets this test by relying on working capital created by sale of assets for the source of the Payments here that exceeds the present value of projected disposable income, and providing a bonus of the actual disposable income that is created during the next three years that actually exceeds the estimated present value of payment of the estimated disposable income on the Effective Date.at a discount rate of 15%.

Because of the increased expenses that would be incurred in the event of a conversion of the

Chapter 11 Cases to cases under Chapter 7, the value of any Distribution to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be also approximate to the value of Distributions under this Plan, although this is no longer the test under SBRA for "best interest". This is because conversion of the Chapter 11 Cases to chapter 7 cases would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals. This would add additional costs to the Estates and delay compared to the time of Distributions under this Plan. Debtor believes that the Estates would have approximately the same funds available for distribution in a hypothetical chapter 7 liquidation than they would if this Plan is confirmed, and therefore Holders of Allowed Claims will recover about the same in the hypothetical chapter 7 cases. Accordingly, Debtor believes that the "best interest" test of even the old Bankruptcy Code Section 1129 is satisfied, though again, meeting that version of "best interest" test is no longer required.

### f.   Liquidation Analysis

The Plan will allow holders of Allowed Claims and Equity Interests approximately what would be available to them in a chapter 7 liquidation. A hypothetical chapter 7 liquidation analysis is attached to this Plan as **Exhibit E**.

As can be seen in the liquidation analysis attached as Exhibit E, the value of any Distributions if the Debtor' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be approximately the same value of the Distributions under this Plan. Especially since a Trustee would likely dispute any amount payable on contingent, disputed, and unliquidated derivative claims, and pay them zero, while the plan proposes to pay $10,000. The Trustee would also seek to offset any claims for distributions of the Estate against claims of the Debtor against the estate for the transfers made from the Company to the Estate in the four years prior to the filing. Therefore, the 60% estate shareholder would receive little or no distribution as

equity. The 40% shareholder would receive only residuals after expenditure of substantial legal costs to resolve the competing claims of the 60% shareholder. These fees are estimated as high as 50% of available cash for distribution.  Accordingly, the Debtor believes that even the old "best interests" test of the Bankruptcy Code section under either 1129 is satisfied, when as aforementioned,   only 11 U.S.C. § 1191's net disposable income or estimated equivalent is a requirement.

### g.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not likely followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. This test still appears to be a test for a Plan under Section 11 U.S.C. § 1191(a).

Therefore, out of abundance of caution, to determine whether the Plan meets this old feasibility requirement, the Debtor have analyzed their ability to meet their respective obligations under the Plan. As part of the analysis, the Debtor have prepared and attached as **Exhibits A, B, C and D** hereto, the historic, current and projected financials.

Based on these financial projections, the Debtor believe that they will be a viable operation following the Chapter 11 Cases when the industry finally returns to normalcy, and the Company has sufficient working capital to survive for three years of continued operational losses. Because we are materially relying on payment from existing cash,   the Plan will meet the feasibility requirements of the Bankruptcy Code.

### h.  Acceptance by Impaired Classes—No Longer Required

Prior to SBRA, the bankruptcy code required, as a condition of confirmation that each class of claims of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and therefore, solicitation of

acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defined acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims would  have voted, before SBRA,  to accept the Plan only if two-thirds in amount of the allowed interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

If a class contains claims eligible to vote and no Holders of Claims eligible to vote in such Class voted to accept or reject the Plan, the Holders of such Claims in such Class were deemed to have accepted the Plan.

As discussed below, SBRA makes this requirement of at least one impaired class obsolete.

### i.    Confirmation Without Acceptance by All Impaired Classes

Prior to SBRA, Section 1129(b) of the Bankruptcy Code allowed a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class without consideration of votes of insiders. Thus, pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan would be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan did not "discriminate unfairly" on the creation and treatment of classes, and was "fair and equitable" with respect to each class of claims or equity interests that are impaired under it, and have not accepted as those terms were defined under that statute.

As above mentioned, however, SBRA under 11 U.S.C. §1181(a) and §1191(b) deletes the requirement of at least one impaired class, as long as the disposable income factor is met. SBRA then further substitutes for the fair and equitable test under old 11 U.S.C. 1129(b) that the test is met if the Plan

proposes to distribute all disposable income as defined, or the equivalent to  disposable income. This Plan proposes that distribution of the equivalent to disposable income.  Under the old fair and equitable test, Debtors could not retain equity in the reorganized Debtor without consent of all creditors, or  at least one impaired class accepted the plan and Debtor's equity retained their interest with provision of new value in the form of new investment into the Debtor. This test is obsolete under SBRA, even though  the new value test would arguably be made by the 60% shareholder, that becomes the 100% shareholder under the Plan following buyout of the 40% shareholder,  allowing the Debtor to retain all proceeds from the sale of corporate property as working capital and foregoing any distribution other than retention of 100% equity interest in the reorganized Debtor.

### j.   Sources of Information Provided

In preparing this combined plan and disclosure statement, the Plan, Debtor reviewed and relied on information contained in its Books and Records, oil and gas industry projections and customer feedback regarding future orders and revenue. Assumptions made include, the market value of fixed assets; the most recent appraisals of the 60% stock owned by the Estate, adjusted for current events including the Covid-19 Pandemic,  and the most recent financial results from operations,  and the purchase  of the 40% equity interest of the Company held by the minority shareholders outside of the Estate  for total consideration of $115,000, which includes releases with respect  to contingent derivative claims that are cancelled under the Plan under the terms of the Stock Purchase Agreement attached hereto as Exhibit "F".

### k.  Accounting Methodology

The Debtor accounting methodology used in preparing their financial information is cost accounting. Straight-line depreciation is used for the depreciation of assets.

### l.   Condition and Performance of Debtor While in Chapter 11

Since  the  plan  was  filed  contemporaneous  with  the  petition,  this  is  reserved  for  the

Confirmation hearing.

### m. Future Management of Debtor & Compensation of Management and Insiders

The Debtor' management will continue to be led by Insider, David R. Johns, Executor of the Estate of Ronald R. Johns, Sr. and consultant to the Company,  who will be compensated $2,000.00 per month, and Jerry Rowell, Acting CEO,  who will be compensated at $5000.00 per month.

### n.  Details Regarding the Plan's Funding & Capital Needs

Debtor does not intend to sell any additional capital assets to fund the Plan. Cash on hand retained by the Company primarily  from the sale of the former office building in 2019,  will be used to fund the purchase price of the 40% equity of the minority shareholders under terms of a Stock Purchase Agreement annexed hereto as Exhibit "F", and a release and settlement agreement annexed hereto as Exhibit "G". The Plan otherwise will be funded from existing cash and continued and increased operations.

With current business and anticipate future business, as reflected in the projections of **Exhibit C** , Debtor believe that they will be able to meet their financial obligations as set forth in this Plan. The projections of **Exhibit C**  reflect the modest .25%  anticipated increase in annual sales and margins based on anticipated global recovery following the anticipated cure for Covid-19 and return to normalcy. The Debtor have received information from customers that there are some large orders in the pipeline which will help Debtor get through 2020-21. Debtor believe that some of their new customers will provide new opportunities and increase revenue. Debtors are also investigating the possibility of synergistic mergers with competitors that could increase their market standing and presence and achieve greater orders during this period of industry consolidation.

Debtor projected capital needs as well as how the Debtor anticipate meeting the needs is

reflected in **Exhibit C and D**. Debtor believe with the approval of this Plan, Debtor will be able to meet their capital needs and fund obligations to make payments under the Plan.

### o.  Assessment of the Collectability of Accounts Receivable

Taking un-collectability into account, Debtor has about $78,867  in accounts receivable at this time.

### p.  Relationship of Debtor with Affiliates

Debtor is owned 60% by the Estate of Ronald R. Johns, Sr. and his wife, Luanne. These two Entities/Persons are affiliates. There are no claims owing from the Company to the Estate based on debt. The estate is retaining 100% of the Company after purchase and cancellation of the shares of minority shareholders.  This interest will be distributed in the related probate case, subject to the voting rights provided to the Executor, David Johns, pursuant to the Plan thru the voting trust contained in Ex. H.

### q.  Avoidable Transfers & Causes of Action

In Debtor' preliminary investigation with regard to prepetition transactions, Debtor identified one major potential cause of action. The claim was for payments made by the Debtor  prior to the filing of this chapter 11 case to Velocity Bank Commercial Capital, ("Velocity") to retire a loan entered into by the Company to pursue litigation that was arguably  the sole  benefit to the Estate of Ronald R. Johns. The date of this loan was July 19, 2016. Because the loan and payment thereof  were authorized by the Company and without objection of all of its shareholders, and the applicable 4 year statute of limitations to attack this loan expired July 19, 2020,   it is unlikely that a judgment could be secured against Velocity, or against the Company for a derivative claim.

Further, the note receivable on the books of the company which includes this amount and includes a claim against the Estate, is deemed uncollectable because the Estate has nominal non-exempt assets, consisting primarily of non-exempt real estate ($287,500)  to satisfy the $2.5 million claim, of which the Estate itself owns 60% of the claim. This valuation is based on the Amended Inventory, Appraisement and

List of Claims filed in the probate records, No, P18012, In re Estate of Ronald Richard Johns, Sr., County

Court, Madison County, Texas filed January 10, 2020. The following quote is instructive:

> In that regard, before a shareholder may bring a derivative suit on behalf of a corporation, he must show that something beyond unsound "business judgment" has governed the board of directors' refusal to act. *Langston v. Eagle Pub. Co., 719 S.W.2d 612, 616 (Tex. App.--Waco 1986, writ ref'd n.r.e.).* HN22 "Under the business judgment rule, a shareholder cannot institute a derivative suit on the corporation's [*17] behalf by merely showing that the decision of the board of directors not to act was unwise, inexpedient, negligent, or imprudent. [citing to *Cates v. Sparkman, 11 S.W. at 849 (Tex. 1889)*].

Thus, to show that the board's decision was not governed by sound business judgment, the minority

shareholders would  had to show that the board of directors' refusal to act was characterized by an ultra

vires, fraudulent, and injurious practice, by an abuse of power, and by an oppression on the part of the

company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and

which, without such interference, would leave the latter with no remedy. *Cates, 11 S.W. at 849." Id. At

616.*

Thus, in Texas, the business judgment rule protects corporate officers and directors from being held

liable to the corporation for alleged breach of duties based on actions that are negligent, unwise,

inexpedient, or imprudent if the actions were within the exercise of their discretion and judgment in the

development or prosecution of the enterprise in which their interests are involved. Directors, or those

acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty

includes the dedication of their uncorrupted business judgment for the sole benefit of the corporation. The

business judgment rule also applies to protect the board of directors' decision to pursue or forgo corporate

causes of action In this connection, the minority shareholders with potential derivative claims approved the

resolution to sell the Company's former headquarters to satisfy the debt that ostensibly only benefitted the

Estate of Ronald R. Johns, Sr.

Tex. Bus. Corp. Act Ann. art. 5.14(C), and applicable statutes of frauds,  thus present an

insurmountable obstacle for a minority  shareholder plaintiff to overcome because, in addition,

no shareholder may commence a derivative proceeding within applicable statutes of limitation until the shareholder files a written demand with the corporation that explains the shareholder's concerns about the corporation's potential cause of action with particularity and requests the corporation—i.e., the board—to take suitable action. Art. 5.14(C)(1). This has not been done timely. The Debtor, as hypothetical Trustee, is subrogated to all of these defenses.

Further, art. 5.14(F) mandates that courts shall dismiss the shareholder derivative lawsuit if independent and disinterested directors or a special investigation committee determines in good faith, after conducting a reasonable inquiry based on the factors as the person or group deems appropriate under the circumstances, that continuing the derivative proceeding is not in the corporation's best interests. Through the provisions of art. 5.14, the Legislature gave directors of most corporations the ability to exercise their business judgment in deciding whether to pursue the corporation's causes of action.

All of this case law argues heavily in favor of accepting the Plan that provides a substantial payment for settlement of claims by the minority shareholders. Alternatively, after conversion to a Chapter 7 liquidation, a Trustee in bankruptcy would energetically apply these principles to zero any contingent derivative claims. Thus, the Plan  proposes a joint satisfaction of the derivative claim, for $10,000 when the claim would be valued at $0 in liquidation, and for the 40% equity interest, and the payment of  $125,000 which exceeds by far the 40% of net disposable income or its equivalent on the Effective Date, with the additional payment of  40% of any actual net disposable income that exceeds the present value of the estimated disposable income provided on the Effective Date.

The Debtor anticipates investigating additional potential claims that Debtor may have against any other third parties. No such claims are known to exist now.

### 4. Risk Factors

Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor' businesses or the Plan and its implementation.

### a.   Bankruptcy Law Considerations

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interest in the class. The Debtor believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement because the Debtor created Classes of Claims and Interests each encompassing Claims or Equity Interests, or hybrids of same, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   Voting Requirements Deleted

As aforementioned, voting requirements under SBRA are dramatically revised,. As a result, consent of creditors is no longer required to confirm a plan over dissenting creditors.  Therefore, it is inconceivable a plan will not be confirmed due to failure to meet voting requirements.

#### 3.   The Debtor's Ability Able to Secure Confirmation of the Plan Under SBRA Have Been Modified and Greatly Relaxed

As previously discussed, old Section 1129 of the Bankruptcy Code  before the SBRA set forth  the prior requirements for confirmation of a chapter 11 plan, and required among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and

is "fair and equitable" with respect to any non- accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan (the "feasibility test"); and (c) the value of the distributions to the non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, which was the so-called "best interest test".

As analyzed, SBRA , 11 U.S.C.§1191(b)  eliminates the so-called "best interest test"  and replaces it with disposable income and also eliminates the separate disclosure statement, while not also insisting that there be "adequate disclosure" in the Plan itself.    This separate disclosure statement then goes beyond SBRA to make sure that there is no problem.

Section 1181(a) and 1191(b) of SBRA likewise disposes of the "fair and equitable" test, which used to mean that the Debtor could not retain equity without consent of creditors, payment of 100% of claims, or proposing new value.

Even with the more liberalized results of SBRA, there is no assurance that the Bankruptcy Court will confirm the plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this disclosure or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the disclosure statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the other  statutory requirements for Confirmation not modified by SBRA are not met. If a chapter 11 plan or reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize their business and what, if anything, Holders of Allowed Claims or Equity Interests against them would ultimately receive with respect to their claims or interests.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtor' emergence from bankruptcy.

### 4. Nonconsensual Confirmation

As aforementioned, in the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan under SBRA that the proponent requests if the Plan proposes to distribute the "disposable income" of the Debtor or the equivalent thereof for at least three (3) years and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan therefore "does not discriminate unfairly" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with Section 1191 of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 5. Continued Risk After Confirmation

Even if the Plan is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry and potential revaluing of their assets sue to the chapter 11 proceedings. Some of these concerns and effects typically become more acute when a

case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtor's goals.

**6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If a bankruptcy court finds that it would be in the in the best interest of the creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed to liquidate the debtor' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the possibility of additional expenses and Claims.

**7. Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in the disclosure statement provided herein cannot be relied on by and Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this disclosure.

**8. Risks of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date

will occur since the Effective Date depends on no third parties filing an appeal of the Confirmation Order. Debtor does not believe there is a likelihood of such an appeal, or if the Confirmation Order is appealed, that the result would be reversal of the Confirmation Order.

### 9. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which would affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by Impaired Classes.

The estimated Claims and creditor recoveries set forth in this disclosure are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of claims may vary from the estimated Claims contained in this disclosure. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### b. The Reorganized Debtor May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtor may not be able to achieve their projected financial results.  The financial projections set forth in this disclosure represent the Debtor's best estimate of Debtor's future financial performance, which is necessarily based on certain assumptions regarding anticipated future performance of the Reorganized Debtor's operations, as well as the domestic and world economies in general, and the industry segments in which the Debtor operates in

particular. A substantial part of the risk of continued operations is negated by the Debtor providing lump sum estimated payments of actual results. Thus, if actual results are poorer, than all the risk is on the Debtor. The tradeoff for this certainly is the creditor does not benefit if operations are materially greater than projected results.

### c.   Risks Related to the Debtors and the Reorganized Debtor's Businesses

#### 1.   The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness

This risk as above analyzed is negated by a lump sum payment of estimated disposable income.

#### 2.   The Reorganized Debtor Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtor's operations, including their ability to execute their business plan will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:

- the Debtor's creditors or other third parties may take actions or make decisions that are inconsistent with and detrimental to the plans the Debtor believes to be in their best interests;

- Debtor may be unable to obtain court approval with respect to certain matters in the Chapter 11 Cases from time to time;

- the Bank Court may not agree with the Debtor's objections to positions taken by other parties;

- the Debtor may not be able to confirm and consummate the Plan or may be delayed in doing so;

- the Debtor may not be able to obtain and maintain normal credit terms with vendors, strategic partners, and service providers;

- the Debtor may not be able to continue to invest in its products and services, which would hurt their competitiveness;

- the Debtor may not be able to enter into or maintain contracts that are critical to its operations at competitive rates and terms, if at all;

- the Debtor may be exposed to risks associated with third parties seeking and obtaining court approval to (i) terminate or shorten the Debtor's exclusivity period to propose and confirm the Plan, (ii) appoint a Chapter 11 trustee or (iii) convert the Chapter 11 Cases to chapter 7 liquidation cases; and

- the Debtor's customers may choose to do business with its competitors.

These risks and uncertainties could affect the Debtor's business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could affect the Debtor' ability to compete for new business and possibly affect the relationships with business partners, vendors, and employees. Because of the risks and uncertainties associated with the Chapter 11 Cases, the ultimate impact of events that occur during these proceedings will have on the Debtor' business, financial condition, and results of operation cannot be accurately predicted or quantified.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtor' Business

The Debtor's future results will be dependent upon the timely and successful confirmation and implementation of a plan of reorganization. If a restructuring is protracted, it could adversely affect the Debtor' operating results, including their relationships with advertising customers, business partners, and employees. The longer the Chapter 11 Cases continue, the more likely it is that the Debtor' advertising customers will lose confidence in the Debtor's ability to reorganize their business successfully and seek to establish alternative commercial relationships. If the Debtor experiences a protracted reorganization, there is a significant risk that the value of the enterprise would substantially be eroded to the detriment of all stakeholders.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

### 4. Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance

During these Chapter 11 Cases, the Debtor's financial results may be volatile as restructuring activities and expenses may significantly impact the Debtor's financial statements. As a result, the Debtor's historical financial performance may not be indicative of its financial performance after the Petition Date.

### 5. Debtor Has Liquidity Needs

The Debtor's ability to fund its operations and capital expenditures requires a significant amount of cash. Debtor's principal sources of liquidity historically have been cash flow from operations, and the retained cash from the sale of the office building. If the Debtor's retention of this cash is interrupted by events in this case, or cash flow from operations decreases as a result of market conditions, demand for their products, or otherwise, the Debtor may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenue over time.

The Debtor thus faces uncertainty regarding the adequacy of its liquidity and capital resources and during the pendency of these chapter 11 cases, may have limited access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtor has incurred significant professional fees and other costs in connections with preparing for these chapter 11 cases and expects to continue to incur significant professional fees and costs throughout. Debtor cannot guarantee that uninterrupted cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtor to satisfy obligations related to these cases until the Debtor are able to emerge from bankruptcy protection.

Debtor long term liquidity requirements and adequacy of its capital resources are difficult to predict at this time. The Debtor's liquidity, including the ability to meet ongoing operational conditions obligations, will be dependent on, amount other things 1) its ability to prevail on retention of cash from sale of the office building; 2) its ability to maintain adequate cash on hand; 3) its ability to generate cash flow from operations; 4) its ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and 5) the cost, duration, and outcome of the chapter 11 cases. The Debtor's ability to maintain adequate liquidity depends, in part upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond Debtor's control.

### 6.   The Debtor Operates in a Highly Competitive Industry

The Debtor operates in a highly competitive industry and may not be able to maintain or increase its current revenues following the emergence from these chapter 11 cases. The Debtor competes with many oil and gas import/export intermediaries and suppliers internationally. Sales revenue and market share is subject to change for various reasons, including consolidation of the Debtor's competitors through processes such as mergers and acquisitions, which could have the effect of reducing Debtor's revenues in certain markets. The Debtor's competitors may develop technology, services, or advertising media that are equal to or superior to those the Debtor provides or that achieve greater market acceptance and brand recognition than the Debtor achieves. It is also possible that new competitors may emerge and rapidly acquire market share from the Debtor. The Debtor's ability to compete depends in part on the Debtor's ability to achieve a competitive cost structure.

### 7.   The Reorganized Debtor May be Adversely Affected by Potential Litigation

The Debtor may be parties to litigation in the future, especially with the respect to the ongoing probate proceedings involving the Estate of Ronald R. Johns, Sr.  Litigation can be

expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtor financial results or their ability to consummate the sales of equity contemplated under the Plan. It is also possible that a party may commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtor may become a party to , or the final resolution of such litigation. The effect of any potential litigation can be detrimental to the Reorganized Debtor's finances.

### 8. The Loss of Employees Could Adversely Affect the Debtor' Operations

As a result of these chapter 11 cases, it is possible that the Debtor may experience increased levels of employee attrition, and that the employees may face distraction and uncertainty. A loss of key personal or erosion of employee moral could adversely affect the Debtor's business and results of operations.

### 9. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With a few exceptions, all Claims that arise prior to the Debtor's filing of their Petitions or before confirmation of a plan of reorganization 1) would be subject to compromise and/or treatment under the plan of reorganization and/or (2) would be discharged in accordance with the terms of the plan of reorganization. However, there can be no assurance that the aggregate amount of such claims that are not subject to treatment under the Plan or that are not discharged will not be material.

### 5. Summary of the Debtor' Assets and Treatment of Claims and Equity Interests

#### a. Summary of Assets

The Debtor filed schedules of all of their assets and liabilities on July 31, 2020.  Complete copies of the schedules are available from the Clerk of the Court. The primary assets of the

bankruptcy estate, their estimated values are reflected in the liquidation analysis attached as **Exhibit E** for each Entity**.** The values contained in the liquidation analysis are those that the Debtor believe reflect the actual market value of the assets, should they be sold or auctioned in a liquidation scenario. These values are not book values based on purchase price as may be reflected elsewhere.

### b.   Summary of the Plan of Reorganization

Debtor shall, as Reorganized Debtor, continue to exist after the Effective Date as legal entities organized in the State of Texas without any prejudice to any right to alter or terminate such existence under applicable state law.

This Plan provides no payment to secured creditors because there are none. The priority claims to the taxing authorities, if any, will also be paid in full in five years. However, Debtor's balance sheets show a current asset of potential overpayment. There are thus no tax payments. Unsecured creditors with claims of professional fees and trade accounts will be paid 50% of their claims in  one single lump sum payment to be made within 180 days of the Effective Date. Unsecured Creditors with claims based on derivative claims against the Debtor shall be paid $10,000.00 with respect to these claims. The same Unsecured Creditors with respect to the 40% equity interest shall be satisfied by sale of their equity interest in the Reorganized Debtor and consideration under the stock purchase agreement for $115,000, paid $65,000 on the Effective Date and $50,000 in a note payable in one year from the Effective Date with interest at prime rate on the Effective Date,  If circumstances allow, Debtor may make earlier payments.

### c.   Administrative and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims have not been classified and thus are excluded from the classes of claims and equity interests set forth in section (d) below. Administrative claims are the claims

allowed under § 503(b) of the Bankruptcy Code for administration of these bankruptcy cases.

All final requests for payment of professional fee claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 90 days after the Effective Date. Retained Professionals shall provide the Debtor with a reasonable and good faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtor before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date and shall provide such estimate no later than five Business Days prior to the anticipated Effective Date. If the Retained Professional does not provide an estimate, Debtor may estimate the amount of unpaid and unbilled fees and expenses. The total estimated amount shall be deposited into the Retained Professional's trust account at least two Business Days prior to the Effective Date. The funds held in the trust account shall be the property of the estates of the Debtor or Reorganized Debtor. When all professional fee claims allowed by the Bankruptcy Court have been paid in full pursuant to one or more final orders of the Bankruptcy Court, any remaining funds held in trust shall be turned over to the Reorganized Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other entity. Alternatively, under SBRA, the Debtor may propose annual installment payments over the three (3) year term of the Plan.

Holders of Administrative Claims may include, without limitation, Wiley Law Group PLLC for professional fees in the estimated amount of $25,000; CPA fees of the court appointed certified public accountant, if an, and attorney's fees for any required representation of the Debtor in probate proceedings by court appointed special counsel.

After the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice, to or

action, order, or approval of, the Bankruptcy Court, should any serves be rendered.

All Statutory Fees that become due and payable prior to the Effective Date shall be paid by the Debtor within thirty (30) days after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable and file any reports as applicable. The Reorganized Debtor shall remain obligated to pay the quarterly fees to the United States Trustee until the Chapter 11 cases are converted, dismissed, or a final decree is issued, whichever occurs first.

Except to the extent that a holder of an Allowed Claim of the type described in § 507(a)(8) of the Bankruptcy Code has been paid prior to the Effective Date or agrees to a less favorable treatment, in full and final satisfaction compromise, settlement, release, discharge of, and in exchange for, each such Allowed Claim and each Holder of such Allowed Claim shall be treated in accordance with the terms set forth in 1129(a)(9)(C) of the Bankruptcy Code and shall receive annual Cash payments commencing on the first anniversary of the Effective Date to pay the aggregate amount of such Claim within five years of the Petition Date. However, the Debtor and Reorganized Debtor shall have the right to pay any such priority tax claim, or any remaining balance, in full, at the time on or after the Effective Date, without premium or penalty. All priority tax claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. The total estimated priority tax claims for Debtor are $-0-.

### d. Summary of Treatment of Claims and Equity Interests

#### i. Classification of Claims and Equity Interests

| Class | Type | Status Under Plan | Treatment | Voting Status |
|-------|------|-------------------|-----------|---------------|
| 1 | Secured   Claim | None | | Not Applicable |

| 2 | Secured   Claim | None | -0- | Not Applicable |
|---|---|---|---|---|
| 3 | Unsecured Claims of Professionals | Impaired | $27,500 | Entitled to Vote |
| 4 | General Unsecured Claims of Derivative Claimants | Impaired | $10,000 | Entitled to Vote |
| 5 | Equity Interest of 40% | Impaired | $115,000 | Entitled to Vote |
| 6 | Equity Interest of 60% | Impaired | Retain 100% | Entitled to Vote |

### ii.  Treatment of Claims and Equity Interests

**1.  Class 1: Secured Claim**

Reserved

**2.  Class 2: Secured Claim**

Reserved

**3.  Class 3: Unsecured Creditors of Professionals**

This class consists of all known non-priority unsecured claims of professionals rendering professional accounting, legal, or other services to the Debtor prior to the filing, whether scheduled or based on proofs of claim on file and some trade claims. Allowed Claims of creditors in Class 3 shall be paid based on a percentage. Creditors will receive a single lump sum payment of 50% of their Allowed Claim paid within 180 days of the Effective Date. Debtors believe the total Allowed Claims in Class 3 will be approximately $45,000. Debtor plans on filing objections to some Claims and the amounts estimated here assume that the Debtor will prevail on their objections.  In addition, Class 3 will be paid a pro rata  of actual net disposable income over three years up to their total Allowed Claim as percentage of their total claims against all Allowed Claims  if that amount is greater than the present value of net disposable income estimated on the Effective Date.

Class 3 is Impaired under the Plan and therefore entitled to vote to accept or reject the

Plan, although such consent is not required.

### 4. Class 4: General Unsecured Claims of Derivative Claimants

This class consists of all known non-priority unsecured claims, whether scheduled or based on proofs of claim on file based on derivative claims against the Debtor. This class does not include the claims in Class 3. These Allowed claims will be satisfied by the payment of $10,000 on the Effective Date which represents 100% of their Allowed Claim. If a greater amount of Allowed Claim is provided, said excess Allowed Claim shall be satisfied on the same terms as Class 3.

Class 4 is Impaired under the Plan and therefore entitled to vote to accept or reject the Plan, although such consent is not required.
.

### 5. Class 5: Equity Interest of Minority Shareholders

This class consist of the holders of the 40% minority equity interest. These claims will be satisfied by the purchase of their 40% interest under the Stock Purchase Agreement (Exhibit "F") and the Release Agreement (Exhibit "G") for the Cash Purchase Price which includes $65,000 in cash on the Effective Date, and $50,000 paid in the Note within one (1) year of the Effective Date with accrued interest at prime rate on the Effective Date. Class 5 is Impaired  under the Plan and is entitled to vote to accept or reject the Plan, although such consent is not required.

### 6. Class 6:  Equity Interest of Majority Shareholders

The Estate of Ronald R. Johns, Sr. and wife, Luanne Johns,

currently holds 60% interest in the Debtor, with the balance of the stock owned by the Class 4 holders.  The Appraisal of this interest, as of February 17, 2018, by an appraisal dated September 18, 2019 stock and ownership interest is $614,2014. This appraisal was done prior to the devastating drop in revenues in the oil industry after that date, and thus must be substantially

discounted.

The reorganized Debtor will be capitalized with 60% of the stock owned by the Estate of Ronald R. Johns, and the 40.000% balance owned by the Class 4 holders of derivative claims that is subject to the Stock Purchase Agreement will be cancelled, leaving the estate with 100% of the stock of the Reorganized Debtor. The note owing from the Estate, and all other claims of the  Company against the Estate will be cancelled, principal and interest.

There is no new value requirement under SBRA. However, if there were, there is an argument for  new value to be provided in the form of the retention of the Reorganized Debtor of any claims to dividends from   cash  proceeds from the sale of the Debtor's offices as working capital. A condition of the Plan shall be a voting trust attached hereto as Exhibit H where David R. Johns and/or his successors and/or assigns shall continue to vote the entire 100.00% in the Reorganized Trust on behalf of the Trust, and Luanne  Johns and/or her heirs

Class 6 is Impaired  under the Plan and is entitled to vote to accept or reject the Plan, although such consent is not required.

7. **Executory Contracts and Leases**

Except for the assumed contracts and leases listed in the following chart, all executory leases and contracts, if any others, are rejected as of the Effective Date. There is no amount to cure. Proofs of claim for damages arising from the rejection of an executor lease or contract must be filed no later than 30 days after the Effective Date. Claims filed after that date will not be paid.

| Contracting Party | Description of Contract |
|---|---|
| WorkSuites | Real Estate Lease |
| | |

If you are a contracting party on an assumed contract and disagree with the cure amounts shown, you must file an objection prior to the objection deadline of sixty (60) days following entry

of the Confirmation Order. If you do not file an objection prior to the objection deadline, the Court may confirm the plan and you will be bound by the terms of the confirmed plan as to the cure amount.

### 8. Claims Objections

Claims objections must be filed not later than 60 days after entry of the order confirming the Plan. The Court, on motion by a party in interest, may extend the deadline. Any such motion must be filed not later than 60 days after entry of the order confirming the plan.

Except for as otherwise provided herein or as agreed to by the Reorganized Debtor, all Proofs of Claim filed after the applicable claims bar date (regular claims and government) shall be deemed disallowed in full and expunged as of the Effective Date, forever barred, estopped, and enjoined from assertion.

On or after the Effective Date, except as provided in the Plan of Confirmation Order, a Proof of Claim may not be amended without prior authorization of the Bankruptcy Court and the Reorganized Debtor. Any unauthorized amended Proof of Claim shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court; provided that the foregoing shall not apply to Administrative Claims.

### 9. Confirmation Procedure

#### a. Hearing

A hearing has been scheduled for _____.m. (Central Time), before the Honorable _____, 515 Rusk Street, Courtroom 404, Houston, Texas 77002, to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court.

#### b.  Procedure for Objecting

Any objection to confirmation of this Plan must: a) be in writing, b) conform to the

---

Debtor's Combined Plan and Disclosure Statement

applicable Bankruptcy Rules, c) be filed with the Bankruptcy Court and served so as to be actually received on or before _____("Confirmation Objection Deadline"), by (i) counsel for the Debtor, Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas, Texas  75201 and ii) the United States Trustee, 515 Rusk Ave, Ste. 3516, Houston, Texas 77002.

Unless an objection is timely filed and served by the Confirmation Objection Deadline, such objection may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### c. Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all applicable requirements of section 1129 of the Bankruptcy Code, as modified under SBRA. Among the requirements for confirmation is that the Plan be: a) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan  distribute the equivalent of  at least three years of disposable income, "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class under SBRA; and b) feasible. The Bankruptcy Court must also find that a) the Plan has classified Claims and Equity Interests in a permissible manner; b) the Plan complies with the other technical requirements of Chapter 11 of the Bankruptcy Code; and c) the Plan has been proposed in good faith. The Debtor believe that the Plan complies, or will comply, with all such requirements.

### d. Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Plan creates separate Classes to deal respectively with the various claims and interests. The Debtor believe that the Plan's classifications place substantially similar Claims and Equity Interests in the same Class and this meet the requirements of section

1122 of the Bankruptcy Code.

### e. Impaired Claims or Equity Interests

Section 1124 of the Bankruptcy Code provides that a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests. Holders of Claims or Equity Interests that are Impaired (except insiders under obsolete cramdown rules) are entitled to vote on the Plan. Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. SBRA has rendered impairment or lack thereof in any event not relevant, since consent of at least one impaired class is no longer required. Therefore, the significance of finding "impairment" or "insiders" is now immaterial.

### f. Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 1, 2, 3,4, 5, and 6  may vote on the Plan. In order to vote on the Plan, you must hold a Claim in Classes 1-6. Debtor will only solicit votes from Holders of Claims that are entitled to vote.Again, the Plan may be confirmed whether or not you consent.

### g. Voting Deadline

The deadline to submit the voting ballot is_____.

In order for the ballots to count, it must be complete and delivered timely to: Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas, Texas 75201. Any legible ballot that is timely received from a party entitled to vote, that contains sufficient information to permit the identification of the party casting the ballot, and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection. The form of Ballot is attached as Exhibit I.

### h. Acceptance of the Plan

Prior to SBRA, an order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. Also, prior SBRA, at least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. Under SBRA, this requirement of at least one impaired class voting to accept the Plan is no longer required. Notwithstanding, the Debtor urges that you vote to accept the Plan, since that greatly assists in the confirmation procedure on meeting the other requirements.

### 10. Provisions Governing Distributions

#### a. Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or electronic wire.

#### b. Distribution Agent

The Reorganized Debtor may employ a Distribution Agent. Should the Reorganized Debtor employ a Distribution Agent, the Distribution Agent shall be empowered to a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; b) make all distributions contemplated under the Plan; c) employ professionals to represent it with respect to its responsibilities; and d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan. Reasonable fees and expenses incurred by the Distribution Agent after the Effective Date shall be paid by the Reorganized Debtor. The Distribution Agent shall not be required to give bond or surety or otherwise provide security for the performance of its duties unless ordered by the Bankruptcy Court.

#### c.  Distributions

Debtor's Combined Plan and Disclosure Statement

Distributions shall be made to the Holders of Allowed Claims after the Effective Date a) to the address of each such Holder as set forth in the Debtor' Books and Records (or if the Debtor have been notified in writing, on or before the date that is 10 Business Days before the Effective Date, of a change of address, to the changed address) or in the Claims registers as of the date of the Confirmation Hearing or (b) on any counsel that has provided notice of representation or appeared in the Chapter 11 Cases on the Holders Behalf; provided that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in, as applicable, any Proof of Claim filed. If no Proof of Claim has been filed, then the address set forth in the Schedules. Notwithstanding anything to the contrary in the Plan, the Debtor, the Reorganized Debtor, and Distribution Agent as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### e. Rule for Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtor and the Holder of a Disputed Claim, or as set forth in a final order, no partial payments and partial distributions should be made with respect to a Disputed Claim until the Disputed Claim has become an Allowed Claim, or has otherwise been resolved by settlement or final order.

### f. Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undelivered or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the it has been determined that the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time the distribution shall be made without interest or other accruals; provided that such distributions shall be deemed

Debtor's Combined Plan and Disclosure Statement

unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the later of (a) the Effective Date and (v) the date of the distribution. After such date, all unclaimed property of interests in property shall revert to the Reorganized Debtor automatically and without a need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

## 11. Effect of Confirmation of the Plan

Except as provided in this Plan, the occurrence of the Effective Date of this Plan shall, and does hereby, act to discharge and release the Claims of all creditors of all interests against the Debtor and the Reorganized Debtor and shall be deemed to constitute a full and complete settlement with such creditors. The Plan constitutes complete satisfaction, discharge, and release of all claims, causes of action of any nature whatsoever, including any interest accrued on claims of from and after the Petition Date, whether known or unknown, against, liabilities, liens on, obligations of, and rights against the Debtor or any of their assets, regardless of whether any of their assets shall have been distributed or retained pursuant to the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date.

Confirmation of the Plan, however, shall not disturb the perfected liens on any class of secured creditors as provided for in this Plan. With respect to the classes of secured creditors holding a secured claim, such creditors shall retain their lien(s) securing such claims until such a time that the secured claim is satisfied.

## 12. United States Trustee Fees

The Debtor will be responsible for timely payment of United States Trustee quarterly fees

incurred pursuant to 28 U.S.C § 1930(a)(6). Any fees due as of the date of confirmation will be paid on the Effective Date. After confirmation, the Debtor will continue to file timely financial reports.

### 13. Miscellaneous Provisions

#### a. Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims and Holders of Equity Interests, and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

#### b. Headings

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan

#### c. Termination of Injunctions or Stays

Unless otherwise provided herein or in another order from the Bankruptcy Court, all injunctions or stays provided for in these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date shall terminate on the Effective Date, at which time the injunctions and stays set forth in this Plan shall take effect. Provided, however, the Confirmation of the Plan shall constitute an injunction against any action by any party that seeks to interfere with the Plan by, directly or indirectly: (i) seeking the removal of David R. Johns as executor or estate representative; (ii) attempting to block the sale of the equity interest; (iii) seeking indirectly to interfere with the Plan by challenging the actions of David R. Johns as executor or estate representative. This Court retains exclusive jurisdiction, in that regard, to any challenges outside of the Plan to the acts of David R. Johns as personal representative pursuant to authority granted under 11 U.S.C. §105 et seq.

### d.   Amendment or Modification of the Plan

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor, at any time before the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor has complied with sections 1125 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtor  may make appropriate technical non-material modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of holders of Claims or Equity Interests.

### e.   Severability

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provisions in this Plan are invalid, void, or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan and shall not require re- solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

### f.   Revocation or Withdrawal of the Combined Plan and Disclosure Statement

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtor revokes or withdraws the Plan, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claim by

or against the Debtor and the Estate.

### g. Exhibits and Schedules

All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

### h. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

### i. Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

### j. Implementation

The Debtor and Reorganized Debtor, as applicable, shall take all steps and execute all documents, necessary to effectuate the provisions contained in this Plan

### k. Inconsistency

In the event of any inconsistency among the Plan and any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.


Dated: August 12, 2020                        Respectfully submitted,
                                              WILEY LAW GROUP, PLLC
                                              By: */s/ KEVIN S. WILEY, SR.*
                                              KEVIN S. WILEY, SR.
                                              Texas Bar No.: 21470700
                                              325 N. ST. PAUL, SUITE 2250
                                              DALLAS, TEXAS  75201
                                              T: (214) 537-9572
                                              F: (972) 298-8717
                                              kwiley@wileylawgroup.com
                                              **COUNSEL FOR DEBTOR**