# Exhibit A

## HISTORICAL FINANCIALS 2011-2018

4:31 PM

# Murphy Shipping & Commercial Services, Inc.     PRELIMINARY

Murphy Shipping & Commercial Services, Inc.
Balance Sheets – Historical

| Tax Return Year:<br>Year Ended: | 2011<br>6/30/2012<br>Amended<br>Tax Return | 2012<br>6/30/2013<br>Amended<br>Tax Return | 2013<br>6/30/2014<br>Amended<br>Tax Return | 2014<br>6/30/2015<br>Amended<br>Tax Return | 2015<br>6/30/2016<br>Amended<br>Tax Return | 2016<br>6/30/2017<br>Amended<br>Tax Return | Interim<br>1/31/2018<br><br>Interpolated | 2017<br>6/30/2018<br>Amended<br>Tax Return |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash | $553,558 | $102,357 | $231,255 | $275,074 | $105,006 | $194,236 | $157,532 | $83,531 |
| Accounts receivable | 997,879 | 1,120,132 | 1,307,171 | 988,680 | 413,667 | 523,641 | 211,066 | 197,737 |
| Unbilled revenue | 434,591 | 677,847 | 408,360 | 105,841 | 119,835 | 128,049 | 128,049 | 139,991 |
| Cost & estimated earnings in excess of bi | 125,428 | 176,780 | 119,633 | 0 | 0 | 0 | 0 | 0 |
| Escrowed funds/Cash advances | 0 | 0 | 2,949 | 0 | 0 | 28,468 | 28,468 | 28,287 |
| **Total Current Assets** | 2,111,456 | 2,077,116 | 2,069,368 | 1,369,595 | 638,508 | 874,394 | 525,115 | 449,546 |
| Property & Equipment, Gross | 3,243,374 | 3,254,785 | 3,285,131 | 3,307,261 | 3,327,334 | 3,328,921 | 3,328,921 | 3,328,921 |
| Accumulated depreciation | (1,840,733) | (1,969,063) | (2,097,084) | (2,233,746) | (2,255,567) | (2,379,753) | (2,435,753) | (2,489,898) |
| **Property & Equipment, Net** | 1,402,641 | 1,285,722 | 1,188,047 | 1,073,515 | 1,071,767 | 949,168 | 893,168 | 839,023 |
| **Other Assets** | | | | | | | | |
| Due from HMS Packing | 24,721 | 24,721 | 24,721 | 24,721 | 24,721 | 24,721 | 24,721 | 0 |
| Loans to shareholder | 798,721 | 1,173,902 | 1,646,774 | 2,229,391 | 2,311,472 | 2,347,349 | 2,390,498 | 2,421,319 |
| Interest receivable from shareholder | 44,070 | 63,893 | 94,534 | 133,410 | 174,570 | 216,432 | 241,455 | 259,328 |
| Loan origination fees, net of amort | 0 | 0 | 0 | 0 | 0 | 30,162 | 30,162 | 29,128 |
| Deposits | 2,892 | 2,892 | 2,892 | 500 | 500 | 500 | 500 | 500 |
| Investment in precious metals | 12,771 | 37,800 | 37,800 | 37,800 | 27,600 | 27,600 | 27,600 | 27,600 |
| Deferred tax benefit | 0 | 0 | 0 | 0 | 241,401 | 445,055 | 516,585 | 567,677 |
| **Total Other Assets** | 883,175 | 1,303,208 | 1,806,721 | 2,425,822 | 2,780,264 | 3,091,819 | 3,231,521 | 3,305,552 |
| **Total Assets** | $4,397,272 | $4,666,046 | $5,064,136 | $4,868,932 | $4,490,539 | $4,915,381 | $4,649,804 | $4,594,121 |
| **Liabilities & Shareholder's Equity** | | | | | | | | |
| **Current Liabilities** | | | | | | | | |
| Accounts payable | $989,143 | $928,182 | $988,036 | $1,029,473 | $473,626 | $191,820 | $206,918 | 268,361 |
| Accrued expenses | 19,419 | 14,770 | 22,544 | 0 | 0 | 0 | 0 | - |
| Due to others | 2,667 | 2,667 | 2,667 | 2,667 | 0 | 0 | 0 | - |
| State and federal tax payable | 73,196 | 59,437 | 11,547 | 3,001 | 7,339 | 3,592 | 3,592 | - |
| FICA tax payable | 25,405 | 30,760 | 33,820 | 41,088 | 41,088 | 41,088 | 63,108 | 78,836 |
| Current portion of deferred tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| Line of credit/Current portion LTD | 0 | 0 | 190,000 | 240,010 | 325,000 | 0 | 0 | 1,464,188 |
| **Total Current Liabilities** | 1,109,830 | 1,035,816 | 1,248,614 | 1,316,239 | 847,053 | 236,500 | 273,618 | 1,811,385 |
| **Long-Term Liabilities** | | | | | | | | |
| Long term debt | 0 | 0 | 0 | 0 | 0 | 1,476,221 | 1,469,359 | 0 |
| Loans from shareholder | 180,000 | 360,000 | 300,000 | 300,000 | 458,691 | 235,732 | 269,132 | 218,080 |
| Deferred taxes | 538,203 | 506,778 | 410,433 | 273,809 | 0 | 0 | 0 | |
| **Total Long-Term Liabilities** | 718,203 | 866,778 | 710,433 | 573,809 | 458,691 | 1,711,953 | 1,738,491 | 218,080 |
| **Total Liabilities** | 1,828,033 | 1,902,594 | 1,959,047 | 1,890,048 | 1,305,744 | 1,948,453 | 2,012,109 | 2,029,465 |
| **Shareholder's Equity** | | | | | | | | |
| Common stock | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Treasury stock | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| Retained earnings | 2,668,239 | 2,862,452 | 3,204,089 | 3,077,884 | 3,283,795 | 3,065,928 | 2,736,695 | 2,663,656 |
| **Total Shareholder's Equity** | 2,569,239 | 2,763,452 | 3,105,089 | 2,978,884 | 3,184,795 | 2,966,928 | 2,637,695 | 2,564,656 |
| **Total Liabilities & Equity** | $4,397,272 | $4,666,046 | $5,064,136 | $4,868,932 | $4,490,539 | $4,915,381 | $4,649,804 | $4,594,121 |
| Total debt | $253,196 | $360,000 | $490,000 | $540,010 | $783,691 | $1,711,953 | $1,738,491 | $1,682,268 |

Account balances shown in blue were interpolated based on changes that occurred between the June 30, 2017 and June 30, 2018 balance sheets. All other account balances for the January 2018 balance sheet are based on the actual balances shown on the internal financial statements provided by the Company.

# Davis/Chambers & Company, Ltd.                                    49

4:31 PM

# Murphy Shipping & Commercial Services, Inc.    PRELIMINARY

**Murphy Shipping & Commercial Services, Inc.**
Common Size Balance Sheets

| Tax Return Year:<br>Year Ended: | 2012<br>6/30/2013<br>Amended<br>Tax Return | 2013<br>6/30/2014<br>Amended<br>Tax Return | 2014<br>6/30/2015<br>Amended<br>Tax Return | 2015<br>6/30/2016<br>Amended<br>Tax Return | 2016<br>6/30/2017<br>Amended<br>Tax Return | Interim<br>1/31/2018<br>Interpolated | 2017<br>6/30/2018<br>Amended<br>Tax Return |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash | 2.2% | 4.6% | 5.6% | 2.3% | 4.0% | 5.7% | 1.8% |
| Accounts receivable | 24.0% | 25.8% | 20.3% | 9.2% | 10.7% | 7.7% | 4.3% |
| Unbilled revenue | 14.5% | 8.1% | 2.2% | 2.7% | 2.6% | 4.6% | 3.0% |
| Cost & estimated earnings in excess of bill | 3.8% | 2.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Escrowed funds/Cash advances | 0.0% | 0.1% | 0.0% | 0.0% | 0.6% | 1.0% | 0.6% |
| **Total Current Assets** | 44.5% | 40.9% | 28.1% | 14.2% | 17.8% | 19.0% | 9.8% |
| | | | | | | | |
| **Property & Equipment, Gross** | 69.8% | 64.9% | 67.9% | 74.1% | 67.7% | 148.3% | 72.5% |
| Accumulated depreciation | -42.2% | -41.4% | -45.9% | -50.2% | -48.4% | -88.3% | -54.2% |
| **Property & Equipment, Net** | 27.6% | 23.5% | 22.0% | 23.9% | 19.3% | 60.0% | 18.3% |
| | | | | | | | |
| **Other Assets** | | | | | | | |
| Due from HMS Packing | 0.5% | 0.5% | 0.5% | 0.6% | 0.5% | 0.9% | 0.0% |
| Loans to shareholder | 25.2% | 32.5% | 45.8% | 51.5% | 47.8% | 1.8% | 52.7% |
| Interest receivable from shareholder | 1.4% | 1.9% | 2.7% | 3.9% | 4.4% | 0.0% | 5.6% |
| Loan origination fees, net of amort | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 1.1% | 0.6% |
| Deposits | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Investment in precious metals | 0.8% | 0.7% | 0.8% | 0.6% | 0.6% | 1.0% | 0.6% |
| Deferred tax benefit | 0.0% | 0.0% | 0.0% | 5.4% | 9.1% | 16.1% | 12.4% |
| **Total Other Assets** | 27.9% | 35.7% | 49.8% | 61.9% | 62.9% | 20.9% | 72.0% |
| **Total Assets** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | | | |
| **Liabilities & Shareholder's Equity** | | | | | | | |
| **Current Liabilities** | | | | | | | |
| Accounts payable | 19.9% | 19.5% | 21.1% | 10.5% | 3.9% | 7.5% | 5.8% |
| Accrued expenses | 0.3% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Due to others | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| State and federal tax payable | 1.3% | 0.2% | 0.1% | 0.2% | 0.1% | 0.1% | 0.0% |
| FICA tax payable | 0.7% | 0.7% | 0.8% | 0.9% | 0.8% | 0.0% | 1.7% |
| Current portion of deferred tax | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Line of credit/Current portion LTD | 0.0% | 3.8% | 4.9% | 7.2% | 0.0% | 0.0% | 31.9% |
| **Total Current Liabilities** | 22.2% | 24.7% | 27.0% | 18.9% | 4.8% | 7.6% | 39.4% |
| | | | | | | | |
| **Long-Term Liabilities** | | | | | | | |
| Long term debt | 0.0% | 0.0% | 0.0% | 0.0% | 30.0% | 53.3% | 0.0% |
| Loans from shareholder | 7.7% | 5.9% | 6.2% | 10.2% | 4.8% | 9.8% | 4.7% |
| Deferred taxes | 10.9% | 8.1% | 5.6% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Long-Term Liabilities** | 10.9% | 14.0% | 11.8% | 10.2% | 34.8% | 63.0% | 4.7% |
| | | | | | | | |
| **Total Liabilities** | 33.1% | 38.7% | 38.8% | 29.1% | 39.6% | 70.6% | 44.2% |
| | | | | | | | |
| **Shareholder's Equity** | | | | | | | |
| Common stock | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Treasury stock | -2.1% | -2.0% | -2.1% | -2.2% | -2.0% | -3.6% | -2.2% |
| Retained earnings | 61.3% | 63.3% | 63.2% | 73.1% | 62.4% | 32.9% | 58.0% |
| **Total Shareholder's Equity** | 59.2% | 61.3% | 61.2% | 70.9% | 60.4% | 29.4% | 55.8% |
| **Total Liabilities & Equity** | 92.3% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

**Davis/Chambers & Company, Ltd.**

# Murphy Shipping & Commercial Services, Inc.     PRELIMINARY

Murphy Shipping & Commercial Services, Inc.
Income Statements - Historical

| Tax Return Year:<br>Year Ended: | 2011<br>6/30/2012<br>Amended<br>Tax Return | 2012<br>6/30/2013<br>Amended<br>Tax Return | 2013<br>6/30/2014<br>Amended<br>Tax Return | 2014<br>6/30/2015<br>Amended<br>Tax Return | 2015<br>6/30/2016<br>Amended<br>Tax Return | 2016<br>6/30/2017<br>Amended<br>Tax Return | 2017<br>6/30/2018<br>Amended<br>Tax Return |
|---|---|---|---|---|---|---|---|
| **Sales** | $13,712,032 | $12,235,289 | $15,374,181 | $10,779,747 | $6,496,252 | $4,433,477 | $2,392,033 |
| **Cost of Goods Sold** | | | | | | | |
| Freight | 9,288,238 | 7,490,244 | 10,257,776 | 7,420,361 | 4,357,502 | 2,814,601 | 1,515,969 |
| Packing and packing materials | 795,063 | 807,577 | 742,570 | 694,237 | 513,459 | 297,210 | 142,181 |
| Cargo insurance | 63,540 | 103,638 | 79,232 | 58,543 | 55,946 | 25,858 | 19,811 |
| Delivery & courier service | 89,142 | 75,426 | 58,495 | 34,908 | 31,462 | 21,434 | 18,952 |
| Cost of labor | 579,249 | 522,511 | 678,219 | 620,530 | 769,113 | 633,115 | 473,567 |
| Warehouse expense | 37,818 | 36,100 | 37,524 | 23,980 | 139,733 | 34,112 | 19,409 |
| Agency fees | 0 | 0 | 699,431 | 0 | 0 | 0 | 0 |
| **Total Cost of Goods Sold** | 10,853,050 | 9,035,496 | 12,553,247 | 8,852,559 | 5,867,215 | 3,826,330 | 2,189,889 |
| **Gross Margin** | 2,858,982 | 3,199,793 | 2,820,934 | 1,927,188 | 629,037 | 607,147 | 202,144 |
| **Expenses** | | | | | | | |
| Officers' compensation | 150,000 | 150,000 | 150,000 | 301,592 | 157,779 | 157,739 | 86,567 |
| Salaries and wages | 1,387,875 | 1,402,758 | 1,418,151 | 1,259,863 | 62,723 | 63,261 | 61,540 |
| Employee benefits | 0 | 73,111 | 195,384 | 0 | 179,284 | 147,330 | 27,918 |
| Taxes and licenses | 201,032 | 357,838 | 228,376 | 244,186 | 143,171 | 131,172 | 94,310 |
| Payroll service fees | 0 | 0 | 0 | 0 | 33,161 | 25,590 | 15,269 |
| Building repairs & maint | 95,816 | 95,035 | 107,324 | 130,069 | 83,203 | 67,929 | 42,328 |
| Computer expense | 27,862 | 40,765 | 29,660 | 55,061 | 43,121 | 31,481 | 22,591 |
| Office, telephone, utilities | 120,213 | 109,116 | 131,797 | 99,516 | 93,218 | 85,879 | 65,418 |
| Insurance | 32,542 | 55,167 | 48,188 | 39,050 | 64,290 | 22,399 | 42,036 |
| Bank service charges | 13,195 | 14,850 | 17,540 | 18,944 | 18,203 | 18,701 | 14,018 |
| Travel & entertainment | 102,813 | 161,703 | 161,571 | 81,159 | 32,273 | 16,881 | 556 |
| Professional & consulting fees | 151,305 | 375,863 | (69,961) | (143,264) | 63,457 | 10,011 | 13,021 |
| Contract labor | 4,051 | 0 | 0 | 0 | 0 | 8,297 | 8,282 |
| Bad debt | 5,187 | 2,534 | 57 | 7,750 | 15,633 | 7,202 | 10,001 |
| Advertising and Promotion | 22,582 | 60,035 | 26,732 | 12,591 | 0 | 0 | 0 |
| Reimburse Personal CC Charges | 0 | (24,678) | (83,289) | (109,239) | (91,258) | (35,877) | (36,222) |
| Other Operating Expenses | 52,013 | 50,778 | 84,622 | 70,225 | 29,563 | 35,172 | 29,396 |
| **Total Operating Expenses** | 2,366,486 | 2,924,877 | 2,446,152 | 2,067,503 | 927,821 | 793,167 | 497,029 |
| **Operating Income** | 492,496 | 274,916 | 374,782 | (140,315) | (298,784) | (186,020) | (294,885) |
| **Other Income (Expense)** | | | | | | | |
| Depreciation & amortization | (139,766) | (128,330) | (128,021) | (136,662) | (9,687) | (125,048) | (92,386) |
| Interest income | 16,259 | 19,824 | 30,642 | 38,876 | 41,159 | 41,862 | 42,896 |
| Interest expense | (12,279) | (7,821) | (11,375) | (3,992) | (11,050) | (132,076) | (136,230) |
| Officer's life insurance | (336) | (336) | (336) | (336) | (336) | (336) | (196) |
| Charitable contributions | (18,184) | (19,900) | (20,400) | (20,400) | (20,400) | (20,400) | (25,300) |
| Other income | (2,618) | 24,436 | 0 | 0 | (10,200) | 497 | (18,793) |
| **Total Other Income** | (156,924) | (112,127) | (129,490) | (122,514) | (10,514) | (235,501) | (230,009) |
| **Earnings Before Taxes (EBT)** | 335,572 | 162,789 | 245,292 | (262,829) | (309,298) | (421,521) | (524,894) |
| Federal tax benefit | 64,894 | (31,424) | (96,345) | (136,624) | (515,210) | (203,654) | (122,622) |
| **Net Income** | $270,678 | $194,213 | $341,637 | ($126,205) | $205,912 | ($217,867) | ($402,272) |
| | | | | | | | |
| **EBITDA** | $492,496 | $274,916 | $374,782 | ($140,315) | ($298,784) | ($186,020) | ($294,885) |
| **EBIT** | 352,730 | 146,586 | 256,667 | (258,837) | (298,248) | (289,445) | (388,664) |
| **EBT** | 335,572 | 162,789 | 245,292 | (262,829) | (309,298) | (421,521) | (524,894) |

**Davis/Chambers & Company, Ltd.**

# Exhibit B

## CURRENT FINANCIALS 2019-2020

# Murphy Shipping & Commercial Services, Inc.
## Balance Sheet
### As of June 30, 2020

|  |  | Total |
|---|---|---|
| **ASSETS** |  |  |
| Current Assets |  |  |
| Bank Accounts |  |  |
| Chase Bank |  | 13,124.03 |
| Chase Savings |  | 345.87 |
| Petty Cash |  | 775.23 |
| Position Wealth |  | 790,430.06 |
| Total Bank Accounts | $ | 804,675.19 |
| Accounts Receivable |  |  |
| Accounts Receivable |  | 78,867.31 |
| Total Accounts Receivable | $ | 78,867.31 |
| Other Current Assets |  |  |
| Deferred Income Tax |  | 567,677.00 |
| Escrow |  | 28,286.84 |
| Loan Interest Receivable |  | 259,327.96 |
| Loan to Shareholder |  | 2,383,571.00 |
| Loan to the Estate |  | 310,004.84 |
| Position Wealth Reinvest |  | 61,011.11 |
| Prepaid Expense |  | 500.00 |
| Total Other Current Assets | $ | 3,610,378.75 |
| Total Current Assets | $ | 4,493,921.25 |
| Fixed Assets |  |  |
| Organizational Costs |  | 800.00 |
| Total Fixed Assets | $ | 800.00 |
| Other Assets |  |  |
| Investment |  | 27,600.00 |
| Total Other Assets | $ | 27,600.00 |
| **TOTAL ASSETS** | $ | 4,522,321.25 |

EX B

# Murphy Shipping & Commercial Services, Inc.
## Profit and Loss
### July 2019 - June 2020

|  | Total |
|---|---|
| **Income** |  |
| Air Freight Income | 302,514.64 |
| Brokerage Commissions | 316.30 |
| Courier Income | 1,981.96 |
| Documentation | 3,260.50 |
| Eventbrite Income | 700.00 |
| Ground Freight Income | 19,088.22 |
| Hazardous Income | 650.00 |
| Import Income | 4,029.00 |
| Insurance Income | 3,344.15 |
| Ocean Freight Income | 173,759.73 |
| Packing & Preparation (deleted) | 45,451.12 |
| Warehouse Services | 21,860.80 |
| **Total Income** | **$ 576,956.42** |
| **Cost of Goods Sold** |  |
| Air Freight Cost | 263,904.94 |
| Cargo Insurance | 625.00 |
| Courier Cost | 2,196.45 |
| Delivery & Courier Service | 9,493.72 |
| Documentation Cost | 306.00 |
| Drayage (deleted) | 9,117.00 |
| Freight | 27,455.53 |
| Imports (deleted) | 11,237.11 |
| Ground Freight Cost | 47,202.93 |
| Hazardous Cost | 375.00 |
| Import Cost | 2,614.45 |
| Insurance Cost | 3,491.36 |
| Ocean Freight Cost | 114,944.29 |
| Packing | 24,190.89 |
| Warehouse Service Cost | 21,103.50 |
| Warehouse Storage (deleted) | 497.70 |
| **Total Cost of Goods Sold** | **$ 538,755.87** |
| **Gross Profit** | **$ 38,200.55** |

# Exhibit C

PROJECTED FINANCIALS 2021-2023

# Murphy Shipping & Commercial Services, Inc.
## Profit and Loss
### July 2019 - June 2020

**EX C**

**PROJECTIONS FOR RETURN TO NORMAL HISTORICAL LEVELS AFTER COVID-19**

| | Total | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Income** | | | | |
| Air Freight Income | 302,514.64 | | | |
| Brokerage Commissions | 316.30 | | | |
| Courier Income | 1,981.96 | | | |
| Documentation | 3,260.50 | | | |
| Eventbrite Income | 700.00 | | | |
| Ground Freight Income | 19,088.22 | | | |
| Hazardous Income | 650.00 | | | |
| Import Income | 4,029.00 | | | |
| Insurance Income | 3,344.15 | | | |
| Ocean Freight Income | 173,759.73 | | | |
| Packing & Preparation (deleted) | 45,451.12 | | | |
| Warehouse Services | 21,860.80 | | | |
| **Total Income** | **$ 575,856.42** | 2,393,033.00 | 2,512,684.65 | 2,638,318.88 |
| **Cost of Goods Sold** | | | | |
| Air Freight Cost | 283,904.94 | | | |
| Cargo Insurance | 625.00 | | | |
| Courier Cost | 2,196.45 | | | |
| Delivery & Courier Service | 9,493.72 | | | |
| Documentation Cost | 306.00 | | | |
| Drayage (deleted) | 9,117.00 | | | |
| Freight | 27,455.53 | | | |
| Imports (deleted) | 11,237.11 | | | |
| Ground Freight Cost | 47,202.93 | | | |
| Hazardous Cost | 375.00 | | | |
| Import Cost | 2,614.45 | | | |
| Insurance Cost | 3,491.38 | | | |
| Ocean Freight Cost | 114,944.29 | | | |
| Packing | 24,190.89 | | | |
| Warehouse Service Cost | 21,103.50 | | | |
| Warehouse Storage (deleted) | 497.70 | | | |
| **Total Cost of Goods Sold** | **$ 538,755.87** | 2,189,889.00 | 2,299,383.45 | 2,414,352.62 |
| **Gross Profit** | **$ 38,200.55** | 203,144.00 | 213,301.20 | 223,966.26 |

# Murphy Shipping & Commercial Services, Inc.
## Profit and Loss
### July 2019 - June 2020

PROJECTIONS FOR RETURN TO NORMAL HISTORICAL LEVELS AFTER COVID-19

| | Total | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Expenses** | | | | |
| Advertising and Promotional Expense | 20,414.47 | | | |
| Automobile Expense | 46.37 | | | |
| Bank Charges & Service Fees | 2,700.07 | | | |
| Brokers Fee | 253.74 | | | |
| Charitable Contribution | 4,617.02 | | | |
| Computer Hardware | 8,792.69 | | | |
| Dues & Subscriptions | 8,609.40 | | | |
| Equipment Lease/Rental | 10,869.71 | | | |
| Gifts | 63.83 | | | |
| Insurance | 11,313.88 | | | |
| Marketing Wages | 23,998.84 | | | |
| Meals and Entertainment | 8,501.66 | | | |
| Office Supplies | 7,901.61 | | | |
| **Payroll Expenses** | | | | |
| Contract Labor | 274,959.57 | | | |
| ER Payroll Taxes | 49,418.03 | | | |
| Salaries & Wages | 241,321.39 | | | |
| **Total Payroll Expenses** | 565,698.99 | | | |
| Postage and Delivery | 639.93 | | | |
| **Professional Fees** | | | | |
| Accounting Fees | 37,369.33 | | | |
| Consulting Fees | 32,987.08 | | | |
| Legal Fees | 20,000.00 | | | |
| **Total Professional Fees** | 19,888.21 | | | |
| | 110,244.62 | | | |
| Rent Expense | 41,551.15 | | | |
| Software Expenses | 35,574.84 | | | |
| Telephone | 4,852.98 | | | |
| Travel Expense | 15,698.00 | | | |
| **Traveling Cost (deleted)** | | | | |
| Mileage (deleted) | 2,118.21 | | | |
| **Total Traveling Cost (deleted)** | 2,118.21 | | | |
| Utilities | 292.00 | | | |
| **Total Expenses** | 884,953.81 | | | |
| **Net Operating Income** | (846,763.26) | 497,029 | 521,880.45 | 547,974.47 |
| | | (293,885.00) | (308,579.25) | (324,008.21) |
| **Other Income** | | | | |
| Interest Income | 144.93 | 144.93 | 152.18 | 159.79 |
| Investment Income | 12,808.91 | 12,808.91 | 13,449.36 | 14,121.82 |
| Position Wealth Investment | 48,259.11 | 48,259.11 | 50,672.07 | 53,205.67 |
| **Total Other Income** | 61,212.95 | 61,212.95 | 64,273.60 | 67,487.28 |
| **Net Other Income** | 61,212.95 | 61,212.95 | 64,273.60 | 67,487.28 |
| **Net Income** | (785,540.31) | (232,672.05) | (244,305.65) | (256,520.94) |

# Exhibit D

## CURRENT OPERATING RESULTS POST-FILING

### (RESERVED)

# Exhibit E

## HYPOTHETICAL LIQIDATION

| Liquidation Analysis | | Chapter 7 Liquidation Assets | 50% Discount for Admin. Exp. | Plan |
|---|---|---|---|---|
| Cash in Bank | | 804,675 | | |
| Accounts Receivable Less Doubtful Accounts *1 | | 78,867 | | |
| Investments | | 61,011 | | |
| Fixed Assets Estimated Auction Value *2 | | -0- | | |
| Total Available for Distribution | | 994,553 | 497,277 | |
| | | | | |
| Accrued payroll taxes | | 0 | | |
| Trustee Commission | | 24,141 | (24,141 | |
| Available for distribution to secured creditors | | n/a | n/a | |
| Available for unsecured creditors | ($130,491) | | 473,136 | |
| | | | | |
| Pay Secured Creditors | | 0 | | |
| Pay Taxing Authority in full no interest 5 years | | 0 | | |
| | | | | |
| Pay unsecured creditors 50% of Claim | | | ($65,245) | 65,245 |
| Pay unsecured creditors 100% of allowed claim on derivative claims | | | (10,000) | 10,000 |
| | | | $397,891 | |
| Balance Available | | | | |
| 40% Equity Claim | | | $159,156 | 115,000 |

# EXHIBIT F

# SHAREHOLDER PURCHASE AGREEMENT

# STOCK PURCHASE AGREEMENT

## BETWEEN

MURPHY SHIPPING AND COMMERCIAL SERVICES, INC.

("Company"),

("BUYER"),

## AND

BOLAJI AGBABIAKA, LINDS WILKENSON, CHARLES ADAMS, EXECUTOR OF THE ESTATE
OF JUNE ADAMS, JERALD HARRIS, AND RANDY YATES, ATTORNEY-IN-FACT FOR
SHERRY WINSMAN

(COLLECTIVELY, "SELLER")

## AUGUST 14, 2020

> This draft document is not a contract, nor does it make or accept an offer for a contract or
> memorialize any agreement between the Parties. No agreement, oral or written, regarding or
> relating to any of the matters covered by this draft has been entered into between the Parties.
> This document, in its present form or as it shall hereafter be revised by either Party, shall not
> become the agreement of the Parties unless and until it has been signed by duly authorized
> representatives of all Parties and signature pages have been exchanged.

---

# COMMON STOCK PURCHASE AGREEMENT

THIS COMMON STOCK PURCHASE AGREEMENT (this "Agreement" or this "Sale") is
made and entered into effective as of August 14, 2020, by and among MURPHY SHIPPING &
COMMERCIAL SERVICES, INC. DBA. GLOBAL LOGISTICS, a Texas corporation,
("Buyer") and BOLAJI AGBABIAKA, ("AGBABIAKA"); LINDS WILKENSON,
("WILKENSON"), CHARLES ADAMS, EXECUTOR OF THE ESTATE OF JUNE
ADAMS, ("ADAMS"); JERALD HARRIS, ("HARRIS")AND RANDY YATES,
ATTORNEY-IN-FACT FOR SHERRY WINSMAN ("WINSMAN") (collectively, the
"Seller"). Copitalized terms used in this Agreement are defined or cross-referenced to the
applicable definition in Section 1.1 of this Agreement.

## RECITALS

WHEREAS, Seller owns 40% of the common voting stock (the "Securities") of the
Company consisting of 400 shares of the common voting stock divided among Agbabiaka with
20%, and all the other named as Seller with 5% each; and

WHEREAS, Buyer desires to purchase the Securities and Seller desires to sell the Securities to
Buyer upon the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the above and the terms and conditions of this
Agreement, the parties agree as follows:

## AGREEMENT

## ARTICLE 1

## DEFINITIONS AND USAGE

### 1.1 DEFINITIONS

"Agreement" -- has the meaning set forth in the introductory paragraph.

"Bankruptcy Court" The United States Bankruptcy Court for the
Southern District of Texas, Houston Division.

"Business" -- has the meaning set forth in the Recitals.

"Business Day" -- any day except Saturday, Sunday or any other day on which
commercial banks in Dallas, Delaware are authorized or required by Legal Requirements to be
closed for business.

"Buyer" -- has the meaning set forth in the introductory paragraph.

"Buyer Indemnified Party" -- has the meaning set forth in Section 6.1(a).

2

"Capital Structure" has the meaning set forth in Section 2.7(a)(xi).

"Cash Purchase Price" -- An amount in U.S. dollars equal to ONE HUNDRED FIFTEEN THOUSAND AND NO/100 DOLLARS ($115,000) payable $65,000 on the Effective Date and the balance of $50,000 in the Note within one year of the Effective Date.

"Closing" -- has the meaning set forth in Section 2.6.

"Closing Date" -- The Effective Date

"Common Stock" --has the meaning set forth in Section 2.7(a)(xi).

"Confirmation Order"—the final and non-appealable order of the Bankruptcy Court.

"Contemplated Transactions" -- the transactions contemplated by this Agreement.

"Disclosure Letter" -- the disclosure letter delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"Effective Date", shall be the date that the Confirmation Order is final and non-appealable under the terms of the Plan.

"Indemnified Party" -- has the meaning set forth in Section 6.9(a).

"Indemnifying Party" -- has the meaning set forth in Section 6.9(a).

"IRS" -- has the meaning set forth in Section 2.5.

"Knowledge" (and any derivation thereof, whether capitalized or not) -- the current, actual knowledge and awareness (and shall not include any deemed or constructive knowledge or awareness).

"Legal Requirements" or "Legal Requirement" -- all applicable federal, state, local, municipal or foreign laws, ordinances, principles of common law, codes, regulations, rules, statutes, directives, Orders and writs of any Governmental Body or any similar provisions having the force and effect of law.

"Liability"-- with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"Note--shall be the promissory note to pay the balance of the Cash Purchase Price within one (1) year from the Effective Date, bearing interest at prime plus 2% on the Effective Date

"Ordinary Course of Business" -- any action that is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"Person" -- an individual, Stock, corporation, business trust, limited liability company, limited liability Stock, joint Stock shares company, trust, unincorporated association, joint venture or other entity, or a Governmental Body.

"Proceeding"-- any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"Purchase Price" -- has meaning set forth in Section 2.3.

"Related Person" -- with respect to any specified Person, as applicable, (a) all senior management employees, officers, directors, managers or equity holders of such Person, (b) all members of the immediate families of the individuals listed in clause (a), and any other Person that directly or indirectly controls, or is under common control with, any Person listed in clauses (a) or (b).

For purposes of this definition, "control" (including "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Securities" -- Means the securities of the Company, voting, non-voting, or otherwise. There are no Securities other than the 1000shares of voting common stock.

"Seller" or "Sellers" -- has the meaning set forth in the introductory paragraph.

"Seller Indemnified Parties" -- has the meaning set forth in Section 6.9(a).

"Tax" or "Taxes" -- any income, corporation, gross receipts, profits, gains, capital Stock shares, capital duty, franchise, gross margin, withholding, social security, unemployment, disability, property, wealth, welfare, stamp, excise, occupation, transfer, documentary, sales, use, value added, stamp, registration, alternative minimum, estimated or other similar tax (including any fee, assessment or other charge in the nature of or in lieu of any tax) imposed by any Governmental Body, and any interest, penalties, additions to tax or additional amounts in respect of the foregoing, and including any transferee or secondary liability in respect of any tax (whether imposed by law, contractual agreement or otherwise).

"Third Party Claim" -- as the meaning set forth in Section 6.9(a).

"Transaction Documents" -- this Agreement, the Transition Services Agreement, and the Warrant.

"Release Agreement" -- has the meaning set forth in Section 2.7(a)(vi).

## 1.2 USAGE

Interpretation and Construction.

(a) In this Agreement, unless the context clearly requires otherwise:

(i) words in the singular form shall be construed to include the plural and vice versa;

(ii) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;.

(iii) pronouns in the masculine, feminine and neuter genders shall be construed to include each other gender;

(iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v) reference to any Annex, Article, Exhibit, Section or Schedule means such Annex, Article, Exhibit, Section or Schedule to this Agreement, unless otherwise indicated;

(vi) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision;

(vii) "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole, including exhibits and schedules thereto, and not to any particular Article, Section or other provision thereof;

(viii) "including," "includes" and "include" shall be deemed, in each case, to be followed by the words "without limitation";

(ix) "or" is used in the inclusive sense of "and/or"; and

(x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b) Notwithstanding anything contained in this Agreement to the contrary, except as otherwise expressly provided in this Agreement, no amount shall be (or is intended to be) included, in whole or in part (either as an increase or a reduction), more than once in the calculation of (including any component of) the components of the Purchase Price, the Purchase Price Adjustment or any other calculated amount pursuant to this Agreement if the effect of such

additional inclusion (either as an increase or a reduction) would be to cause such amount to be given duplicative effect.

(c) The specification of any dollar amount in the representations and warranties or otherwise in this Agreement or in the Disclosure Letter is not intended and shall not be deemed to be an admission or acknowledgment of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties to determine whether any obligation, item, or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement (other than with respect to any representation, warranty, or provision of this Agreement in which such specification occurs).

## ARTICLE II

## SALE AND TRANSFER OF SECURITIES; CLOSING

### 2.1 SECURITIES TO BE SOLD

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, and Buyer hereby purchases and acquires from the Seller, free and clear of any Encumbrances, all of the Seller's right, title and interest in the Securities of the Company.

### 2.2 EXCLUDED ASSETS FROM SALE OF SECURITIES OF THE COMPANY

Reserved.

### 2.3 PURCHASE PRICE

The aggregate purchase price for the Securities (the "Purchase Price") will consist of the Cash Purchase Price. The Cash Purchase Price shall be paid in the amount of $65,000 on the Effective date, with the $50,000 balance paid under the the terms of the Note.

### 2.4 LIABILITIES

Reserved

### 2.5 ALLOCATION

Reserved.

### 2.6 CLOSING

The purchase and sale provided for in this Agreement (the "Closing") is taking place at the offices of Buyer's counsel, WILEY LAW GROUP, PLLC 325 N. ST. PAUL, SUITE 2750, DALLAS, DELAWARE 75201, on the

Closing Date. The Closing shall be deemed effective at 12:01 a.m., Central Standard Time (CST), unless Buyer and Sellers agree otherwise. Notwithstanding the foregoing, the parties have endeavored in good faith to effectuate the Closing simultaneously in different locations to avoid the travel and additional expense of requiring all parties to be simultaneously located in the same place. In furtherance thereof, the parties have delivered, in escrow to their respective counsel and other appropriate parties, executed versions of all assignments, instructions, documents, certificates, wire transfer instructions, escrow instructions, and other matters and things necessary to affect the Closing in such manner.

## 1.7 CLOSING OBLIGATIONS

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a) Sellers delivered or caused to be delivered the following certificates outlined below and agreed as represented in "Seller's Certificate":

(i) Reserved

(ii) Reserved

(iii) Reserved

(iv) Reserved

(v) Reserved

(vi) Reserved

(vii) to Buyer, the executed Release Agreement, in the form of Exhibit 2.7(a)(vii);

(viii) to Buyer, the executed non-disclosure, confidentiality, and non-compete agreements in the form of Exhibit 2.7(a)(viii);

(ix) Reserved.

(x) Reserved.

(xi) to Buyer, a certificate with respect to (i) The names of all of the holders of Common Stock Shares representing the Securities, (ii) the number of shares held by each holder and (iii) the names and number of shares of any other person or entity that is entitled to obtain, whether by virtue of the transactions contemplated hereby or otherwise, as the result of any outstanding subscriptions, options, warrants, calls, rights, convertible securities or any other agreements or commitments of any kind or nature and a description of such security, instrument or agreement. All of the Common Stock shares have been duly authorized, validly issued, fully paid and nonassessable, and not subject to preemptive rights that have not been waived or satisfied or any Stock agreements, voting trusts or other arrangements. Except as set forth in the certificate and to the knowledge of the Seller, there are no other shares of capital or other securities (whether or not such securities have voting rights) of the Company issued or outstanding (other than the 60%

of the Common Stock in the Buyer owned by the Estate of Ronald R. Johns, Sr.) or any subscriptions issued or outstanding or any subscriptions, options, warrants, calls, rights, convertible securities or other agreements or commitments of any character or nature obligating any of the holders or the Company to issue, transfer or sell, or cause the issuance, transfer or sale of, any shares of capital Stock shares or other securities (whether or not such securities have voting rights) of the Company. Except as set forth in this certificate, and to the knowledge of Seller, there are no outstanding contractual obligations of any kind or nature of any of its holders or the Company or any affiliate thereof related to the purchase, sale, issuance, repurchase, redemption, acquisition, transfer, disposition, holding or voting of any shares of capital Stock shares or other securities of or the management or operation of the Company. No person has any right to participate in, or receive any payment based on any amount relating to, the revenue, income, value or net assets of the Company or any component or portion thereof, or any increase or decrease in any of the foregoing.

(xii) Reserved

(xiii) Reserved

(xiv) Reserved

(xv) Reserved

(xvi) Reserved

(xvii) Reserved

(xviii) Reserved

(xix) Reserved

(xx) A certificate in the Form of Exhibit 2 (a)(7)(xx) that except as disclosed in said certificate, no broker, investment banker, financial advisor or other person, other the fees and expenses of which will be paid in accordance with this Agreement, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Stock shares-holders. Seller indemnifies and holds Buyer harmless from any claims from any such broker, investment banker, financial advisor, or other person disclosed by Seller as having been retained by Seller

(xxi) Reserved

(xxii) Reserved

(xxiii) Reserved

(xxiv) Reserved

(xxv) Reserved

(xxvi) Reserved

(xxvii) Reserved

(xxviii) Reserved

(xxix) Reserved.

(xxx) Reserved

(xxxi) Reserved

(xxxii) to Buyer, the Securities fully endorsed and assigned to the Buyer, along with Stock transfer ledgers, such other Stock transfer documents, deeds, certificates of transfer, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance reasonably satisfactory to Buyer and executed by the applicable Seller or Buyer.

(xxxiii) No Additional Representations. THE SELLER IS/ARE NOT MAKING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER WITH RESPECT TO THE COMPANY, INCLUDING ANY OF THE ASSETS OF THE COMPANY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, AND EXCEPT AS SET FORTH EXPRESSLY HEREIN, THE CONDITION OF THE ASSETS OF THE COMP ANY SHALL BE "AS IS" AND "WHERE IS."

(b) Reserved

(c) Seller delivered such other documents as may be reasonably requested by Buyer, each in form and substance reasonably satisfactory to Buyer and executed by Seller.

(d) Buyer delivered or paid, or caused to be delivered or paid, the following:

(i) to Seller, the Purchase Price (of which the cash portion thereof shall be made by wire transfer of immediately available funds to an account specified by Sellers) and the related notes;

(ii) to Seller, a certificate of the Secretary of Buyer certifying to the incumbency and signatures of the officers of Buyer executing this Agreement and any other Transaction Document; and,

(iv) such other documents as may reasonably be requested by Seller, each in form and substance reasonably satisfactory to Seller and executed by Buyer.

2.8 CLOSING DATE PURCHASE PRICE ADJUSTMENT AND PAYMENT. RESERVED

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Letter, Seller represents and warrants to Buyer as of the date that the certificates provided in Section 2.7(a) are true and correct, and further represents and warrants to Buyer that:

(i) Seller has good and indefeasible title to the Securities sold to Buyer hereunder and at the Closing will transfer the Securities to Buyer free and clear of all Encumbrances.

(ii) Seller owns of record and beneficially 100% of the equity securities of the Company.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as of the date hereof as follows:

## 4.1 ORGANIZATION AND GOOD STANDING.

Buyer is a corporation duly organized, validly existing, and in good standing under the laws of Delaware, with full organizational power and authority to conduct its business as it is now being conducted.

## 4.2 AUTHORITY; NO CONFLICT

Upon the Effective Date of the Confirmation Order, this Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement constitutes the legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Legal Requirements affecting creditors rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Upon the execution and delivery by Buyer of the other Transaction Documents to which it is or will be a party (assuming the authorization, execution and delivery by each other party thereto), such Transaction Documents will constitute the legal, valid, and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Legal Requirements affecting creditors rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity. Buyer has all necessary organizational power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party and to perform its obligations under this Agreement and the other Transaction Documents.

(b) Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will directly or indirectly (with or without notice or lapse of time) conflict with or violate or breach any Legal Requirement applicable to Buyer or the Governing Documents of Buyer, except, in the case of the foregoing clause (i), to the extent such conflicts, violations or breaches would not, in the aggregate, materially adversely affect the ability of Buyer to consummate the Contemplated Transactions.

(c) Buyer is not required to give any notice to or obtain any approval, consent, ratification, waiver or other authorization from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions, except to the extent the failure to obtain such authorizations would not, in the aggregate, materially adversely affect the ability of Buyer to consummate the Contemplated Transactions.

(d) Reserved

## 4.3 BROKERS OR FINDERS

Buyer has not agreed to incur, directly or indirectly, any liability for brokerage fees, finder's fees, consultant commissions, or agents' commissions or other similar charges in connection with this Agreement or any of the Contemplated Transactions.

## ARTICLE V

## ADDITIONAL COVENANTS

## 5.1 EMPLOYMENT MATTERS

a) Reserved

## 5.2 USE OF NAME

Except as provided for as Permitted by this Section 5.2, from and after the Closing, Seller's former owners will not use the name "MURPHY SHIPPING & COMMERCIAL SERVICES DBA GLOBAL LOGISTICS", in connection with provision of export and import services to anyone during the restricted period of the Covenant Not to Compete.

## 5.3 INVESTIGATION; NO OTHER REPRESENTATIONS OR WARRANTIES

(a) Buyer acknowledges that it has made its own inquiry and investigation into, analysis, and, based thereon, has formed an independent judgment concerning, the Business and the Securities.

## 5.4 FURTHER ASSURANCES

11

The parties shall cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement after the Closing, and the parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

## 5.5 COVENANT NOT TO COMPETE

(a) For a period of one (1) year following the Closing Date, except as otherwise permitted by Section 5.2, Seller, Seller will not, throughout the marketing area of the Business, directly or indirectly seek to compete in the provision of export/import services by becoming an employee, shareholder, owner or investor of any business similar to or potentially competitive with the Business.

(b) For a period of one (1) year following the Closing Date, Seller, Seller's current owners will not, throughout the marketing area of the Business, directly or indirectly recruit, seek to employ, consult with, or engage employees of the Business, not seek to solicit or provide competing services to any customer of the Business that was such a customer for the preceding twelve months period prior to the Closing Date.

(c) For a period of one (1) year following the Closing Date, Seller, Seller's current owners will not, throughout the marketing area of the Business, directly or indirectly disclose proprietary information pertinent to the Business, including but not limited to, customer lists, supplier pricing, business strategies, and other confidential information.

(d) Reserved

(e) The Parties further mutually acknowledge, agree and covenant that should any term or provision of this Section 5.5 be deemed overbroad or unduly burdensome by a court of competent jurisdiction, then the proper remedy shall be, and all parties involved shall jointly request that the ruling court reform the overbroad or unduly burdensome provisions of Section 5.5 to comply with Delaware law.

## 5.6 ACCESS TO INFORMATION

Reserved

## ARTICLE VI

## INDEMNIFICATION

## 6.1 INDEMNIFICATION OF BUYER INDEMNIFIED PARTIES

12

Subject to the terms and conditions of this Agreement, Seller shall defend, indemnify and hold Buyer and its officers, directors, managers, members, employees, representatives, undersigned attorneys, and/or agents (the "Buyer Indemnified Parties") harmless from and against any and all Losses suffered or incurred by any Buyer Indemnified Party to the extent caused by any of the following:

(a) any breach of any representation or warranty made by Sellers in this Agreement;

(b) any breach or default in the performance of any agreement or covenant of Sellers required by this Agreement to be performed by them; and

(c) Reserved.

**6.2 INDEMNIFICATION OF SELLER INDEMNIFIED PARTIES.**

Subject to the terms and conditions of this Agreement, Buyer shall defend, indemnify and hold Seller and its officers, directors, managers, members, employees, representatives, undersigned attorneys, and/or agents (the "Seller Indemnified Parties") harmless from and against any and all Losses suffered or incurred by any Seller Indemnified Party to the extent caused by any of the following:

(a) any breach of any representation or warranty made by Buyer in this Agreement;

(b) any breach or default in the performance of any agreement or covenant of Buyer required by this Agreement to be performed by them; and

**6.3 SURVIVAL AND TIME LIMITATIONS.**

All representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement and the Closing until 5:00 p.m., Central Standard Time (CST) on January 31, 2021 (the "Expiration Date"), each covenant or agreement contained in this Agreement to be performed at or prior to Closing shall survive the execution and delivery of this Agreement and the Closing until 5:00 p.m. Central Standard Time (CST) on the ninetieth (90th) day after Closing; and each covenant or agreement contained in this Agreement to be performed after the Closing shall survive in accordance with its terms until fully performed. Notwithstanding the foregoing, the representation and warranty of Seller as to the title and ownership of the Securities shall survive indefinitely. Any indemnification claim made under Section 6.1 or Section 6.2 must be asserted in a written indemnity claim delivered to the Indemnifying Party in accordance with Section 6.8 prior to 5:00 p.m. Central Standard Time (CST) on the last day of the respective survival period as specified in this Section 6.3 and may not be asserted after such date; provided, however, that any indemnification claim for which a written indemnity claim is given within the time period set forth above shall survive until such claim has been finally resolved in accordance with this Article VI.

**6.4 DEDUCTIBLE AMOUNT; MAXIMUM CLAIM**

The Buyer Indemnified Parties shall not be entitled to indemnification pursuant to Section 6.1(a) unless and until the aggregate amount of Losses from claims indemnifiable under Section 6.1(a) exceeds Fifty Thousand Dollars ($50,000) (the "Deductible Amount") (and, then, only to the extent of such excess). The Parties mutually acknowledge, understand and agree that this section 6.4 shall not apply to any fees and expenses incurred by Buyer arising out of claims that concern, refer or relate to any Retained Liability, Excluded Asset or Seller Related Party claims.

**6.5 EXERCISE OF RIGHTS BY INDEMNIFIED PARTIES**

Indemnification claims of the Seller Indemnified Parties may be made and enforced hereunder solely by Buyer on their behalf. The Cash Purchase Price and the Management Agreement shall be subject to Seller's indemnification obligations.

**6.6 NO DUPLICATION OF RECOVERY**

Any amounts payable pursuant to this Article VI shall be paid without duplication (e.g. if one Buyer Indemnified Party is reimbursed for a Loss, another Buyer Indemnified Party may not be reimbursed for the same Loss), and in no event shall any Indemnified Party be indemnified under different provisions of this Agreement (including Article III) for the same Loss if such indemnification would result in duplication of payment of such Loss. Without limiting the generality of the foregoing, Seller shall not have any liability pursuant to this Article VI in respect of any item or any Loss that has been reimbursed from insurance. No Indemnified Party shall be entitled to indemnification for any Loss to the extent the events, occurrences or circumstances giving rise to such Loss were disclosed in the Disclosure Letter.

**6.7 NET LOSSES; SUBROGATION; MITIGATION**

(a) Notwithstanding anything contained herein to the contrary, the amount of any Losses for which an Indemnified Party may be entitled to indemnification under this Article VI shall be reduced to the extent of (i) any insurance proceeds that the Indemnified Party or any of its Related Persons actually receives with respect to such Losses (including those from affiliated insurance companies), less any deductibles, costs, and expenses actually incurred in connection with making any claim or obtaining such insurance proceeds, and (ii) any Tax benefit that actually reduces the Taxes of the Indemnified Party arising from the incurrence or payment of any such Loss (net of any Tax detriment to such Indemnified Party). Each Indemnified Party shall exercise commercially reasonable efforts to obtain such proceeds, benefits and recoveries. If any such proceeds, benefits or recoveries are received by an Indemnified Party or any of its Related Persons with respect to any Losses after payment has been made to the Indemnified Party with respect thereto, the Indemnified Party shall promptly pay back, or cause its appropriate Related Person to pay back, the amount of such proceeds, benefits or recoveries (up to the amount received by the Indemnified Party with respect to such Losses, subject to the limitations herein) to the Indemnifying Party.

(b) Upon an Indemnified Party's receipt of any indemnification payments in respect of any Losses, the Indemnifying Party shall, to the extent of such payment, be subrogated to all

13

14

rights and claims of the Indemnified Party against any Person in respect of the Losses to which such payment relates. In such a case, the Indemnified Person shall execute all instruments reasonably necessary to evidence or further perfect such subrogation rights.

(c) Each party entitled to indemnification under this Article VI shall use commercially reasonable efforts to mitigate Losses after becoming aware of an event that would reasonably be expected to give rise to any Losses that are indemnifiable or recoverable under this Article VI.

6.8 CLAIMS.

(a) Claim Procedure. If a Buyer Indemnified Party is entitled to indemnification pursuant to this Article VI (the "Indemnified Party") intends to make an indemnity claim under this Agreement, then the Indemnified Party shall deliver to the Party or Parties obligated to provide indemnification pursuant to this Article VI (the "Indemnifying Party") a written indemnity claim (a) stating that the Indemnified Party has paid or suffered, or expects to pay or suffer, Losses in an aggregate amount (which may be estimated or described) and, to the extent such information is available to the Indemnified Party, the individual items of Losses (which may be estimated or described) that are included in the aggregate amount and (i) stating that the Indemnified Party believes in good faith that it is entitled to indemnification from the Indemnifying Party pursuant to this Agreement with respect to such Losses and specifying the indemnification provisions contained in this Agreement upon which the indemnity claim is being made. Notwithstanding the foregoing, an indemnity claim that is based on a claim from a Person that is not a Party or an affiliate of a Party (a "Third Party Claim") need only include a description (and a copy of all pleadings and correspondence to or from any third party related thereto, if available) of the Third Party Claim together with a statement that the Indemnified Party is entitled to indemnification with respect to such Third Party Claim and any other information that the Indemnified Party deems appropriate. Unless the Indemnified Party and Indemnifying Party agree in writing to another process at that time, the Indemnifying Party shall have 30 days (i) to object to such claim (other than a Third-Party Claim), and failing to timely object and submit, shall promptly pay to the Indemnified Party an amount sufficient to fully indemnify the Indemnified Party from and against such Losses in accordance with this Article VI.

(b) Third Party Claims.

(i) The Indemnified Party shall give the Indemnifying Party reasonable notice of the assertion or commencement by any Person of any Third Party Claim against the Indemnified Party in accordance with Section 6.8(a); provided, however, that any failure on the part of the Indemnified Party to notify the Indemnifying Party shall not limit any of the obligations of the Indemnifying Party under this Agreement except to the extent that such failure materially and materially prejudices the defense of such Third Party Claim. In the event of the assertion or commencement by any Person of any Third Party Claim against an Indemnified Party with respect to which the Indemnifying Party is, or could be determined to be, obligated to indemnify and hold harmless the Indemnified Parties pursuant to this Agreement, the Indemnifying Party shall be entitled to assume the defense of any Third Party Claim with counsel reasonably satisfactory to the Indemnified Party, at the Indemnifying Party's sole expense; provided, however, that the Indemnifying Party shall not be entitled to assume or continue control of the defense of any Third

Party Claim (A) to the extent that the Third Party Claim seeks an injunction or equitable relief against any Indemnified Party, (B) if the interests of the Indemnifying Party and the Indemnified Party with respect to such claim are in conflict with one another and, as a result, the Indemnifying Party could not adequately represent the interests of the Indemnified Party in such claim, or (C) if the Indemnifying Party fails to give written notice that it shall assume the defense of such Third Party Claim within 30 days after receiving the Indemnified Party's written indemnification claim notice pursuant to Section 6.8(a).

(ii) If the Indemnifying Party assumes the defense of any Third Party Claim, (A) it shall not settle, adjust or compromise or permit a default or consent to entry of any judgment in respect of the Third Party Claim without the prior written consent of the Indemnified Party unless such settlement, adjustment, compromise or judgment (1) does not entail any admission of liability, criminal offense or a violation of any Legal Requirement on the part of any Indemnified Party, (2) includes an unconditional full and complete written release of each Buyer Indemnified Party or Seller Indemnified Party, as applicable from all Losses with respect to such Third Party Claim, and (3) involves solely monetary damages; and (B) the Indemnified Party shall have the right (but not the obligation) to participate in the defense of such Third Party Claim and to employ, at its own expense, counsel separate from counsel employed by the Indemnifying Party.

(iii) If the Indemnifying Party does not or is not permitted to assume the defense of a defense thereof, the Indemnified Party shall not settle, adjust or compromise or permit a default or consent of any judgment in respect of any Third Party Claim if the Indemnifying Party shall have any obligation as a result of such settlement (whether monetary or otherwise) unless such settlement, adjustment, compromise, or judgment is consented to in writing by the Indemnifying Party, such consent not to be unreasonably withheld, conditioned, or delayed. All reasonable attorneys' fees and other costs and expenses relating to the defense by the Indemnified Party shall be included in Losses if the Indemnified Party is, or is determined to be, entitled to indemnification pursuant to this Agreement.

(iv) Each party shall cooperate and cause their respective Representatives and Related Persons to cooperate, in the defense or prosecution of any Third-Party Claim. Without limiting the generality of the foregoing, if the Indemnified Party assumes the defense of a Third-Party Claim in accordance with this Section 6.8(b), the Indemnifying Party shall make available to the Indemnified Party any documents and materials in its possession or control that may be necessary to the defense, negotiation or settlement of such Third-Party Claim. Without limiting the generality of the foregoing, if the Indemnifying Party assumes the defense of a Third-Party Claim in accordance with this Section 6.8(b), the Indemnified Party shall make available to the Indemnifying Party any documents and materials in its possession or control that may be necessary to the defense, negotiation or settlement of such Third-Party Claim. Any consent to be given by the Buyer Indemnified Parties under this Section 6.8(b) shall be given by Buyer acting on behalf of the Buyer Indemnified Parties and any consent to be given by the Seller Indemnified Parties under this Section 6.8 shall be given by Seller acting for and on behalf of the Seller Indemnified Parties.

(c) With respect to a Third Party Claim under this Section 6.8, after (i) any final decision, judgment, or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, (ii) a settlement shall have been consummated, or (iii) the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement, (if the Indemnified Party is a Buyer Indemnified Party, the Buyer Indemnified Party shall forward to Seller notice of any sums due and owing by it in accordance with this Agreement with respect to such matter and Seller shall pay all of such remaining sums so due and owing to the Buyer Indemnified Party in accordance with this Article VI.

## 6.9 EXCLUSIVE REMEDY

From and after Closing, the sole and exclusive remedy with respect to any and all claims (whether such claim is framed in tort, contract or otherwise, but other than claims arising from intentional fraud on the part of a party in connection with the Contemplated Transactions) for any breach of any representation, warranty, covenant, agreement, or obligation set forth herein or otherwise relating to the transactions contemplated here, shall be pursuant to the indemnification provisions set forth in this Article VI. In furtherance of the foregoing, except in connection with intentional fraud on the part of a party in connection with the Contemplated Transactions, each party hereby waives, to the fullest extent permitted under Legal Requirements, any and all rights, claims, and causes of action for any breach of any representation, warranty, covenant, agreement, or obligation set forth herein or otherwise relating to the Contemplated Transactions it may have against the other parties and their Related Persons and each of their respective Representatives arising under or based upon any Legal Requirement or in equity, except pursuant to the indemnification provisions set forth in this Article VI.

## 6.10 NO WAIVER FOR FRAUD RELATED CLAIMS

Notwithstanding any provision of this Agreement to the contrary, the liability of any Party under this Article VI will be in addition to, and not exclusive of, any other liability that such party may have at law or equity based on such party's fraud, misrepresentation, fraud in the inducement, fraudulent concealment or conspiracy (collectively "Fraud Claims") in connection with the Contemplated Transactions. No provision set forth in this Agreement, including any other provision of this Article VI, will be deemed a waiver by any party to this Agreement of any right or remedy which such party may have at law or equity based on any other Party's Fraud Claims in connection with the Transactions, nor will any such provision limit, or be deemed to limit, (a) the amounts of recovery sought or awarded in any such claim for Fraud Claims, (b) the time period during which a Fraud Claim may be brought, or (c) the recourse that any such Party may seek against another Party with respect to Fraud Claims in connection with the Transactions; provided, however, that with respect to such rights and remedies at law or equity, the parties further acknowledge and agree that none of the provisions of this Section 6.11 will be deemed a waiver of any defenses that may be available in respect of actions or Fraud Claims, including defenses of statutes of limitations or limitations of damages.

## 6.11 ADJUSTMENT IN PURCHASE PRICE

The parties agree that all indemnification amounts pursuant to Section 6.1 constitute an adjustment to the Purchase Price for all purposes, including for Tax purposes.

## ARTICLE VII

## GENERAL PROVISIONS

## 7.1 EXPENSES

Except, as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective fees and expenses incurred. Fees shall include but is not limited to in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its Representatives.

## 7.2 NOTICES

All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

To Seller:

[TO BE ADDED]

With a Copy to:
[INSERT BUYER REPRESENTATIVE]

To Buyer:

Jerry Rowell, President
Murphy Shipping & Commercial Services, Inc. DBA Global Logistics
2001 Timberloch Pl, Suite 500
The Woodlands, Texas 77380
djohn@murphyship.com

With a Copy to:

WILEY LAW GROUP, PLLC
325 N. St. Paul Street, Suite 2250

Dallas, TX 75201
Attention: Kevin S. Wiley, Sr.
Email: kwiley@wileylawgroup.com
Fax: (972) 449-5717

## 7.3 Informal Mediation and Arbitration.

In the event of any dispute arising out of or relating to this Agreement or any agreements contemplated hereby, including any question regarding any such agreement's existence, validity or termination (collectively referred to herein as a "Dispute"), then prior to filing any litigation proceeding as provided in Section 7.3 of this Agreement, the party intending to file such a proceeding shall be required to notify the other party or parties in writing of the existence and nature of the Dispute. The party intending to file such a proceeding and the other party or parties each agree that within twenty (20) business days of the other party or parties' receipt of such notice, the parties shall meet at the principal office of Seller or Buyer, or other agreed place, for a minimum of two (2) consecutive eight (8) hour days in order to attempt to amicably resolve the dispute. If such informal dispute resolution efforts prove to be unsuccessful, the notifying party may initiate litigation proceedings pursuant to Section 7.3 of this Agreement. In any action, proceeding, or litigation between Buyer and Seller arising out of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs from the non-prevailing party.

## 7.4 JURISDICTION; SERVICE OF PROCESS

Any Proceeding arising out of or relating to this Agreement or any Contemplated Transaction may be brought in the District Courts of the State of Texas, County of Madison, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of Texas, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court, and agrees not to bring any Proceeding arising out of or relating to this Agreement or any Contemplated Transaction in any other court. The parties agree that either or both of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the first sentence of this Section may be served on any party anywhere in the world.

## 7.5 ENFORCEMENT OF AGREEMENT

Each party acknowledges and agrees that the other parties would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any violation or breach of this Agreement by it could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which the other party may be entitled, at law or in equity, it shall be entitled to

## 7.6 WAIVER

Neither any failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

## 7.7 ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including any Letter of intent and any confidentiality agreement between Buyer and Seller) and constitutes (along with the Disclosure Letter, Exhibits and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by each party hereto.

## 7.8 DISCLOSURE LETTER

(a) The information in the Disclosure Letter constitutes (i) exceptions to particular representations, warranties, covenants and obligations of Sellers as set forth in this Agreement or (ii) descriptions or lists of assets and liabilities and other items referred to in this Agreement. If there is any inconsistency between the statements in this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in this Agreement will control.

enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent any violations or breaches or threatened violations or breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

(b) The inclusion of any information in the Disclosure Letter shall not be deemed an admission or acknowledgement, in and of itself and solely by virtue of the inclusion of such information in the Disclosure Letter, that such information is required to be listed in the Disclosure Letter or that such items are material to the Business or Sellers. The headings, if any, of the individual sections of the Disclosure Letter are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of this Agreement. The Disclosure Letter is arranged in sections corresponding to those contained in Article III merely for convenience, and

the disclosure of an item in one section of the Disclosure Letter as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of the Disclosure Letter with respect to such other representations or warranties or the presence or absence of a reference thereto in either the Disclosure Letter or in the particular representation or warranty.

7.9 ASSIGNMENTS; SUCCESSORS AND NO THIRD-PARTY RIGHTS

(a) No party may assign any of its rights or delegate any of its obligations under this Agreement, by operation of law or otherwise, without the prior written consent of the other parties, except that Buyer may, upon prior written notice to Sellers and Buyer, collaterally assign its rights hereunder to any financial institution providing financing in connection with the Contemplated Transactions. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties. No assignment shall limit the assignor's obligations hereunder.

(b) Except as provided in Article VII, nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement and their successors and permitted assigns any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. No party shall have the right or power to make any assignment of rights or delegation of obligations not permitted by this Section 7.9, and any assignment of rights or delegation of obligations in violation of this Section 7.9 shall be void and of no force or effect.

7.10 SEVERABILITY

If any term or provision of this Agreement is held invalid, illegal or unenforceable by any court of competent jurisdiction, the other terms and provisions of this Agreement will remain in full force and affect so long as the economic or legal substance of the Contemplated Transactions is not affected in any manner materially adverse to any party. Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable. Upon a determination that any term or other provision is invalid, illegal or unenforceable, Buyer and Sellers shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible

7.11 GOVERNING LAW

This Agreement will be governed by and construed under the laws of the State of Texas without giving effect to any choice or conflict of laws principle or rule that would require the application of any other Legal Requirements other than those of the State of Texas.

7.12 EXECUTION OF AGREEMENT; COUNTERPARTS; ELECTRONIC SIGNATURES

(a) This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

(b) The exchange of copies of this Agreement or of any other document contemplated by this Agreement (including any amendment or any other change thereto) and of signature pages thereof by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of an original Agreement or other document for all purposes. Signatures of the parties transmitted by facsimile, by electronic mail in .pdf form or by any other electronic means referenced in the preceding sentence, or by any combination thereof, shall be deemed to be original signatures for all purposes.

7.13 NO DIRECTOR OR AFFILIATE LIABILITY

This Agreement may only be enforced against, and any Proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the parties hereto and then only with respect to the specific obligations set forth in this Agreement with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, Stock shares holder, agent, attorney, Related Person or other Representative of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party under this Agreement or for any claim or Proceeding based on, in respect of, or by reason of the Contemplated Transactions.

7.14 TIME

Time is of the essence in each and every provision of this Agreement and the other Transaction Documents.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first stated above.

**SELLER:**

**BOLAJI AGBABIAKA**

DATE:_____

**LINDA WILKENSON**

DATE:_____

**CHARLES ADAMS, EXEUCTOR OF THE ESTATE OF JUNE ADAMS**

DATE:_____

**JERALD HARRIS**

DATE:_____

**RANDY YATES, ATTORNEY-IN-FACT FOR SHERRY WINSMAN**

**BUYER:**

**MURPPHY SHIPPING & COMMERCIAL SERVICES, INC. DBA GLOBAL LOGISTICS**

By:_____
Name:_____
Its: Authorized Officer

---

**LIST OF EXHIBITS**

EXHIBT 1. APPRAISAL OF 60% INTEREST OWNED BY ESTATE OF RONALD R. JOHNS, SR.

EXHIBT 2. PLAN OF REORGANIZATION FOR MURPHY SHIPPING & COMMERCIAL SERVICES, INC.

EXHIBT 3. PROPOSED ORDER OF CONFIRMATION OF THE PLAN

# EXHIBIT G

# SHAREHOLDER RELEASE

## RELEASE AGREEMENT

THIS RELEASE AGREEMENT (this "Agreement" or this "Release") is made and entered into as of ___, 2020 , by and among MURPHY SHIPPING & COMMERICAL SERVICES, INC, DBA **MURPHY GLOBAL LOGISTICS**, a Texas corporation, ("Buyer") and **BOLAJI AGBABIAKA, ("AGBABIAKA"); LINDS WILKENSON, ("WILENSON"), CHARLES ADAMS, EXEUCTOR OF THE ESTATE OF JUNE ADAMS, ("ADAMS"); JERALD HARRIS, ("HARRIS")AND RANDY YATES, ATTORNEY-IN-FACT FOR SHERRY WINSMAN ("WINSMAN")** (collectively, the "Seller"). Capitalized terms used in this Agreement are defined or cross-referenced to the applicable definition in Section 1.1 of this Agreement.

WHEREAS, BUYER and SELLER have a dispute whether BUYER entitled to recover for derivative claims against BUYER'S principal shareholder(the "Dispute"); and,

WHEREAS, both Parties wish to set aside their differences with respect to the Dispute and move forward so that each may focus on their respective core businesses; and,

WHEREAS, BUYER's willingness to continue to be bound by the release terms contained herein is specifically conditioned upon each of SELLER and/or its successors, assigns and affiliates honoring its respective remaining obligations under this Agreement; and,

WHEREAS, SELLER's willingness to continue to be bound by the release terms contained herein is specifically conditioned upon each of BUYER and/or his successors, assigns and affiliates honoring its respective remaining obligations under this Agreement; and,

WHEREAS, the Parties have mutually agreed on terms to resolve the Dispute as set forth in this Agreement;

NOW, THEREFORE, in accordance with the foregoing recitals and in consideration of the mutual covenants and consideration contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     Releases.

(a)     Release by SELLER . SELLER, for collectively themselves, his/her/their predecessors, successors, subsidiaries, parent companies, partners, lenders, investors and its/their successors, representatives, and assigns, and each of its past and present officers, directors, shareholders, employees, subsidiaries, divisions, partners, partnerships, principals, joint ventures, affiliates, agents, accountants, attorneys, insurers and representatives of any kind, if any (collectively, the SELLER Releasing Parties") hereby absolutely and irrevocably releases, waives, relinquishes and forever discharges BUYER and BUYER's respective , successors, affiliates, agents, ,attorneys, consultants, accountants, insurers and representatives of any kind and assigns, and each of its/ their past and present officers, directors, shareholders, employees, subsidiaries, divisions, partners, partnerships, principals, joint ventures, affiliates, agents, suppliers, customers, consultants, accountants, attorneys, insurers and representatives of any kind, if any (collectively, the "BUYER Released Parties") from and against any and all claims, disputes, demands, actions, liabilities, damages, suits in equity, accounts, costs, expenses, set-offs, contributions, attorneys' fees and/or causes of action of whatever kind or

character, whether state, federal or common law, whether at this time suspected, known or unknown, whether anticipated or unanticipated, whether liquidated or un-liquidated, accrued or un-accrued, which have been raised, could have been raised or may in the future be raised by SELLER and/or the SELLER Released Parties, arising out of or related to any matter, fact, issue or claim alleged by BUYER against SELLER or by SELLER against BUYER in the Dispute as of the date of this Agreement. Notwithstanding the foregoing, nothing in this Agreement shall preclude or prohibit any of the Parties from seeking damages or any other relief for any act in violation of this Agreement.

(b)     Release by BUYER. BUYER, for itself, its successors, and assigns, and each of its/their respective past and present officers, directors, shareholders, employees, subsidiaries, divisions, partners, partnerships, principals, joint ventures, affiliates, agents, accountants, attorneys, insurers and representatives of any kind, if any (collectively, the "BUYER Releasing Parties") hereby absolutely and irrevocably releases, waives, relinquishes and forever discharges SELLER and SELLER 's respective predecessors, successors, subsidiaries, parent companies, and assigns, and each of their past and present officers, directors, shareholders, employees, subsidiaries, divisions, partners, partnerships, principals, joint ventures, affiliates, agents, suppliers, customers, accountants, attorneys, insurers and representatives of any kind, if any (collectively, the "SELLER Released Parties") from and against any and all claims, disputes, demands, actions, liabilities, damages, suits in equity, accounts, costs, expenses, set-offs, contributions, attorneys' fees and/or causes of action of whatever kind or character, whether state, federal or common law, whether at this time suspected, known or unknown, whether anticipated or unanticipated, whether liquidated or un-liquidated, accrued or un-accrued, which have been raised, could have been raised or may in the future be raised by BUYER, arising out of or related to any matter, fact, issue or claim alleged by BUYER against SELLER or by SELLER against BUYER in the Dispute as of the date of this Agreement. Notwithstanding the foregoing, nothing in this Agreement shall preclude or prohibit any of the Parties from seeking damages or any other relief for any act in violation of this Agreement.

2.      Continued Effect of Release by BUYER. BUYER shall continue to be bound by the terms of the Release by BUYER set forth in Section 1 above for so long as SELLER continues to be bound by the terms of the Release by SELLER . If SELLER exercises a right pursuant to this Agreement to declare the terms of the Release by SELLER null and void, then the Release by BUYER shall thereupon become null and void.

3.      Continued Effect of Release by SELLER. SELLER shall have the right to declare the terms of the Release by SELLER set forth in Section 1 above null and void if BUYER exercises a right pursuant to this Agreement to declare the terms of the Release by BUYER null and void, the release by SELLER shall thereupon become null and void.

4.      Covenant Not to Sue. The Parties shall not, and shall cause its affiliates, agents, employees, officers, directors, partners, shareholders, successors, assigns and legal representatives not to, directly or indirectly, commence, maintain, initiate, prosecute, join in, or in any manner seek relief through, or cause, encourage, assist, volunteer, advise or cooperate with any other person or entity to commence, maintain, initiate, prosecute, join in, or in any manner seek relief through, any action, lawsuit, proceeding, investigation, charge, or claim before any court, legislative body or committee, or administrative agency (whether state, federal, or otherwise) with respect to the Dispute.

2

5.      No Admission of Liability.  The Parties expressly acknowledge and agree that this Agreement has been entered into for the purpose of settling the Dispute, on the terms and conditions set forth herein.  Neither the terms nor the existence of this Agreement will be construed as an admission of any wrongdoing or liability on the part of either of the Parties, nor will the terms or the existence of this Agreement be admissible as evidence in any proceeding other than for purposes of enforcement of the provisions of this Agreement.

6.      Confidentiality and Non-Disparagement.  The Parties agree that they will maintain the terms of this Agreement as strictly confidential, and will not disclose such terms hereof to any person or any entity not a party to this Agreement,  unless required to do so by law, or until such information becomes known to the public through no fault of the disclosing party; except that it is agreed among the Parties that they may disclose the terms of this Agreement to a Party's financing sources, prospective buyers of the business of a Party, regulators and administrative agencies, or to any other entity in order to meet its reporting or disclosure obligations.  In the event that any of the Parties is required by legal process to disclose the terms of this Agreement, such party shall promptly notify the other Parties to this Agreement.

Obligation to Not Disparage.  Each party agrees that he will not publish any statement or make any statement (under any circumstances that would reasonably be expected to become public) Disparaging (as defined below) of the other or any of their respective affiliates, officers, directors, managers and employees; provided that, nothing in this Section  shall prevent  any party from (a) responding in a truthful manner to inquiries from regulators or a party's  auditors or insurers, to the extent required by applicable Law, (b) responding in a truthful manner by denying any Disparaging remarks, comments or statements concerning  a party so long as such response does not contain other Disparaging remarks, comments or statements prohibited by this Section.  "Disparaging" remarks, comments or statements are those that impugn a person or entity's honesty, integrity, business acumen, or malign the quality of the person or entity's products or services or other similar negative statements in connection with the other party's, owners, management, employees,  business or operations.

7.      Binding Agreement.  This Agreement is binding on and inures to the benefit of the Parties, their affiliated and subsidiary companies, and their officers, directors, shareholders, agents, employees, licensees, franchisees, distributors, sales representatives, successors and assigns.

8.      Entire Agreement and Modification.  This Agreement contains, and is intended to contain, a complete statement of the entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersedes all prior statements, representations, discussions, agreements, draft agreements, undertakings, and term sheets, whether written or oral, express or implied, of any and every nature with respect thereto.  This Agreement may be modified, amended or supplemented only by subsequent written agreement between the Parties.

9.      Execution in Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one instrument.

10.     Severability.  If any provision of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remainder of the Agreement will not be affected, and in lieu of each provision that is found to be illegal, invalid or unenforceable, a provision will be added as a part of the Agreement that is as similar to the illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

11.     Governing Law and Dispute Resolution.  The governing law and dispute resolution provisions of the State of Texas shall apply to this Agreement.

12.     Non-Waiver.  No course of dealing, course of performance or failure of any Party to strictly enforce any term, right or condition of this Agreement shall be construed as a waiver of any term, right or condition.

13.     Full Authority.  The Parties represent that they have the full authority to execute, deliver and fully perform this Agreement and that the person executing this Agreement on their behalf is authorized to do so.

14.     Headings.  The headings in this Agreement are descriptive only and solely for convenience in reference to the Agreement and shall be given no effect in the construction or interpretation of the Agreement.  Any capitalized term not otherwise defined in this Agreement shall have the meaning given to such term in the Subscription Agreement.

15.     Fees and Expenses.  Each of the Parties shall be responsible for the payment of its own legal fees, costs and expenses in connection with the Dispute.

16.     Exhibits.  Annexed hereto are exhibits that demonstrate the Corporate Formation and all subsequent filings of DSG that show MG with no interest in DSG after the initial formation.


IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on their behalf by their duly authorized representatives, on the date first set forth above.

**SELLER:**

_____

**BOLAJI AGBABIAKA**

**DATE:**_____

_____

**LINDA WILKENSON**

**DATE:**_____

_____

**CHARLES ADAMS, EXEUCTOR**

4

**OF THE ESTATE OF JUNE ADAMS**

      **DATE:**_____

_____

      **JERALD HARRIS**

      **DATE:**_____

_____

      **RANDY YATES, ATTORNEY-IN-FACT FOR SHERRY WINSMAN**

**BUYER:**

**MURPPHY SHIPPING & COMMERCIAL SERVICES, INC. DBA GLOBAL LOGISTICS**

By: _____
Name:
Its: Authorized Officer

# EXHIBIT H

# VOTING TRUST

MURPHY SHIPPING & COMMERCIAL SERVICES, INC.

D/B/A

MURPHY GLOBAL LOGISTICS

VOTING TRUST AGREEMENT

THIS AGREEMENT is entered into EFFECTIVE the 12TH day of AUGUST, 2020 by and among DAVID JOHNS, JERRY ROWELL, AND TIM NOVAK and (collectively referred to as "Trustees") and the undersigned holders of certain shares of stock of MURPHY SHIPPING & COMMERCIAL SERVICES, INC. DBA MURPHY GLOBAL LOGISTICS(the "Company".). The voting stock of the (that is, the stock of the Company as to which the holders are entitled to vote in the election of directors of the Company) now or hereafter issued, or any portion thereof, is hereinafter referred to as the "Shares", and the registered holder of the Shares is hereinafter referred to as the "Shareholder." The shareholder signatory hereto and the registered holder of the Shares which may later be deposited with the Trustees pursuant to Paragraph 19 hereof are hereinafter collectively referred to as the "Depositing Shareholder." The Shares now or hereinafter deposited with the Trustees pursuant to Paragraphs 1 and 19 hereof, as well as any Shares deposited with respect to such Shares, are hereinafter referred to as the "Trust Shares."

WHEREAS, the Deposition Shareholder is the owner of Shares of the capital stock of the Company in the amount set forth opposite his respective signature hereto; and

WHEREAS, in order to secure continuity, competency and stability of policy and management of the Company in the interests of all of the stockholders thereof, the Depositing Shareholder deems it advisable and is desirous of creating a trust in the manner set forth hereinafter; and

WHEREAS, the Trustees have consented to act under this Agreement for the purposes herein provided;

NOW, THEREFORE, in consideration of the agreements contained herein and of the terms and provisions hereof, the parties hereto covenant and agree as follows:

1. **Transfer of Shares to Trustee**

A. The Depositing Shareholder shall, simultaneously with the execution of this Agreement, and Confirmation of the Plan of Reorganization of the Company by a final and non-appealable order, shall be deemed to have transferred to and deposited with the Trustees a stock certificate representing the number of Shares set forth beside his/her/its respective signature to this Agreement.

B. The stock certificate so deposited shall be deemed endorsed in blank by the Depositing Shareholder (or accompanied by stock assignments executed in blank) so that the Trustees may cause such Shares to be reissued by the Company in the name of the Trustees and reflecting that they are issued pursuant to this Agreement and the Confirmation Order.

2. **Filing Agreement in Company Office.** A duplicate copy of this Agreement shall be filed in t11e office of the Company in accordance with applicable Texas law. The Trustees shall take all action necessary to cause the stock certificate issued to the

Trustees to reflect that it is issued pursuant to this Agreement and the Confirmation Order and to cause the Company's stock transfer records to reflect that such transfer is made pursuant to this Agreement.

3. **Voting Trust Certificate.** In exchange for the Trust Shares deposited with them hereunder, the Trustees shall deliver to each Depositing Shareholder a Voting Trust Certificate or Certificates (a "Trust Certificate") substantially in the form attached hereto as Exhibit A, representing the total number of Trust Shares deposited by him hereunder. Each Trust Certificate issued by the Trustees shall reflect the same record ownership of shares of the Company as the certificate representing the Trust Shares surrendered in exchange therefor.

4. **Transfer of Trust Certificate.** The Trust Certificates shall be transferable on the books of the Trustees only on surrender thereof by the registered holder thereof (the "Depositing Shareholder") or by his attorney duly authorized, and in accordance with rules from time to time established for that purpose by the Trustee, and until so transferred the Trustees may treat the registered holder as owner of the Trust Certificates for all purposes whatsoever.

5. **Restrictions on Transfer of Trust Certificates.** Transfer of each Trust Certificate shall be restricted to the same extent as the -transfer of the Trust Shares represented by such Trust Certificate.

6. **Resignation of Trustees.** Any Trustee may resign at any time by delivering to the Successor Trustees his resignation in writing, to take effect on the day mentioned therein.

7. **Successor Trustee.** In the case of a Trustee's death, resignation, or removal or inability to act, the remaining Trustees may elect by majority vote, a replacement Trustee. If no remaining Trustee, the Trustee shall be selected by a majority of the Board of Directors.

8. **Voting and Books and Records.**

A. Trust Shares registered in the Trustees' names shall be voted as the Trustees shall determine, and they may cast the votes so determined in person or by proxy at any meeting of the Company's Shareholders. The Trustee shall keep at a place available to holders of the Trust Certificates correct and complete books and records of account relating to the Trustees, a record of the voting of the Trust Shares at meetings of the Company's Shareholders, and a record containing the names and addresses of all persons, who are holders of Trust Certificates, the number and class of shares represented by each Trust Certificate held by them, and the dates when they became the owners thereof. The record may be in written form or in any other form capable of being converted into written form within a reasonable time.

B. Each Depositing Shareholder agrees for himself, his successors and assigns, to accept and be bound by the determination of the Trustees. At any meeting attended by the Trustees, the Trustees may vote in person or by proxy, and any Trustee may give a power of attorney to any other person to sign for him any written consent to action without a meeting or any other document requiring his signature as a Trustee. The Trustees may adopt their own rules of procedure.

C. Except for Paragraph 7 hereinabove, all matters to be decided by the Trustees shall be determined by the affirmative vote or written consent of the Trustees.

D. Any action required or permitted to be taken at any meeting of the Company's Shareholders may be taken without a meeting if the action is taken by a majority of the Trustees. The action must be evidenced by one or more written consents describing the action to be taken, signed by the Trustees approving such action, and delivered to the Company for inclusion in the books and records of the Company.

9. **Limited Liability of Trustees.** The Trustees shall not incur any responsibility by reason of any matter of thing done or suffered or omitted to be done under this Agreement, except for their own intentional misconduct or gross neglect. The Trustees may vote in any elections, and may serve, as an officer and/or director of the Company.

10. **Expenses.** The Trustees may incur such expenses in the exercise of their powers and duties hereunder as shall be reasonably necessary. All such expenses, as well as expenses in connection with the formation of this Trust, may be paid out of dividends received on Trust Shares and, in anticipation of such dividends, the Trustees may borrow money to pay expenses. The balance remaining from the dividends so received shall be distributed by them to the Depositing Shareholders. To the extent that funds are not available to pay all such expenses from dividends received on the Trust Shares, each Depositing Shareholder shall be liable in solido for any and all such expenses.

11. **Lost Certificates.** Upon receipt by the Trustees of evidence satisfactory to them of the loss or destruction of any Trust Certificate together with an indemnity agreement satisfactory to the Trustees indemnifying them and the other parties hereto against any loss, damage, or expense which they may sustain by reason of such loss or the replacement thereof, the Trustees shall issue a duplicate Trust Certificate in lieu of the Trust Certificate so lost or destroyed. At their discretion, the Trustees may require a bond securing such indemnity agreement.

12. **Trustee's Voting Responsibilities.** In voting the Trust Shares, the Trustees shall exercise their best judgment on all matters that may come before any meeting of Shareholders. The Trustees, in their capacity as such, assume no responsibility for the management of the Company or any action taken by it.

13. **Exercise of Rights of Depositing Shareholders.** Except as provided in Paragraph 14 below, during the term of this Agreement, the Trustees shall, in respect of all Trust Shares, possess and be entitled to exercise all the rights of each Depositing Shareholder with respect to the Trust Shares including, but not limited to, the right to vote and take part in or consent to any corporate or shareholders' action, the right to inspect the books and records of the Company, the right to receive such notices of the Company as Shareholders may be entitled to receive and the right to receive dividends and distributions with respect to the Trust Shares, but the Trustees shall have no power or authority to sell all or any portion of the Trust Shares, or to exchange the Trust Shares or any portion thereof for other stock or securities of the company or any other company.

14. **Limitation on Trustees' Voting Rights.** The Trustees shall give each Depositing Shareholder prompt notice of any proposal to come before the Shareholders to liquidate, dissolve, merge, consolidate, sell all or substantially all of the assets or otherwise reorganize, recapitalize, or restructure the Company and shall request written instructions from each Depositing Shareholder as to how the Trust Shares represented by the Trust Certificates held by him should be voted on such proposal. As to any Trust Shares as to which the Trustees receive prior to the vote on such proposal written instructions as to how such Trust Shares should be voted, the Trustees shall vote such Trust Shares as instructed. As to the voting of Trust Shares with respect to which no such instructions are received, the Trustees shall exercise their own best judgment.

15. **Dividends and Other distributions; Exchanges and Conversations; Subscription Rights.**

A. In the event that the Trustees shall receive cash or property, including stock or other securities (other than Shares), as a dividend or distribution upon the Trust Shares, each Depositing Shareholder shall be entitled to receive from time to time, such dividends or distributions received by the Trustees upon the Trust Shares represented by the Trust Certificates held by such Certificate Holder.

B. In the event that the Trustees shall receive additional Shares as a stock dividend upon the Trust shares or pursuant to a stock split, or for any other reason, the Trustees shall hold the Shares so received as additional Trust Shares subject to all the provisions of this Agreement, but each Depositing Shareholder shall be entitled to receive from the Trustees a Trust Certificate or Certificates

representing the number of Shares so received upon the Trust Shares represented by the Trust Certificates held by him.

C. In the event of an exchange of the Trust Shares or the conversion of the Trust Shares into cash or property, including stock or securities (other than Shares)] pursuant to a recapitalization, reorganization, merger, consolidation, or other transaction, any cash or property other than voting stock received shall be distributed to the Trustees and each Depositing Shareholder shall be entitled to receive, from time to time, such proceeds, and any voting securities received shall be held by the Trustees and the Trust Certificate shall be deemed to represent such voting stock. If the Trust should ever cease to hold voting stock, the Trust shall automatically terminate, and the Trustees shall take such actions as they deem necessary and appropriate to dissolve the Trust.

D. Whenever dividends or other distributions are declared upon Trust Shares, payable on a certain date to Shareholders of record on an earlier date[ the Depositing Shareholders of record on such record date shall be entitled to receive the payment of such dividends as if they had been Shareholders of record on the record date1 and no transfer of a Trust Certificate after the record date shall carry with it the right to receive any such dividends unless the parties to such transfer shall otherwise instruct the Trustees in writing.

E. If any stock or other securities of the Company1 whether now or hereafter authorized, are offered for subscription to the Trustees as holders of the Trust Shares2 the Trustees shall, promptly upon receipt of notice of such offer, mail a copy of such notice to each Depositing Shareholder. The Trustees may also, in

their discretion, fix a record date for determination of the Depositing Shareholders entitled to exercise such subscription rights. Upon receipt by the Trustees, at least five days prior to the last date fixed by the Company for subscription and payment, of a request from any Certificate Holder to subscribe on his behalf and payment of the funds required to pay for the securities subscribed for, the Trustees shall make such subscription and payment. Upon receiving from the Company, the certificate or other evidence of the securities subscribed for, the Trustees shall deliver to such registered holder either (1) a Trust Certificate with respect thereto if such securities are Shares; or (2) a certificate or other appropriate evidence thereof; if such securities are not Shares. If requested by the Trustees, such holder shall pay any stamp tax or other governmental charge or expense in connection therewith. Any Shares issued pursuant to such subscription rights shall be issued in the name of the Trustees. The Trustees shall be under no liability for any omission or failure to exercise the rights of subscription referred to herein.

16. **Voting Rights or Depositing Shareholders.** On all matters submitted to a vote of the Depositing Shareholders, each holder of record of a Trust Certificate shall be entitled to cast, in person or by a proxy authorized in writing to cast his votes] that number of votes as the holders of the Trust Shares represented by such Trust Certificate would be entitled to cast in the election of directors of the Company. A meeting of Depositing Shareholders may be called by the Trustees or by Certificate Holders holding in the aggregate Trust Certificates representing not less than ten (10%) percent of the Trust Shares. Notice of such meeting shall be given to all Depositing Shareholders not later than ten (10) days prior to the date of such meeting. A meeting

of Depositing Shareholders properly called on due notice may be organized for the transaction of business whenever the holders of a majority of the total voting power are present, in person, or by a proxy authorized in writing. In the case of Trust Certificates held by a usufructuary, with another person holding a naked ownership interest therein, the usufructuary only shall be entitled to vote.

17. **Deliveries.**

A. On the termination of this Agreement and the receipt of Trust Certificates duly endorsed in blank or accompanied by stock assignments duly executed in blank by the registered holders thereof, together with a sum sufficient to reimburse the Trustees for any stamp taxes or other governmental charges in connection with the transaction, the Trustees shall deliver to the Company for each such Trust Certificate, certificates representing a number of Shares equal to the number of Trust Shares represented by such Trust Certificate, together with appropriate transfer instructions, and shall deliver directly to the Depositing Shareholders the proceeds of the sale, exchange or conversion of all or part of the Trust Shares.

18. **Notices.**

A. Any notice to be given to a Depositing Shareholder shall be sufficiently given if placed in United States mail, postage prepaid, to such holder at the address furnished by such holder to the Trustees or, if no such address had been furnished, to such holder's last known address, with a copy to:

Kevin S. Wiley

Wiley Law Group, PLLC

325 N. St. Paul, Ste. 2250

Dallas, Texas 75201

kwiley@wileylawgroup.com

Any notice to be given to the Trust shall be sufficiently given if placed in United States mail, postage prepaid, and addressed to the Trustees at 2001 Timberloch, Suite 500, the Woodlands, Texas 77380 or such other address specified by the Trustees. with a copy to:

Kevin S. Wiley

Wiley Law Group, PLLC

325 N. St. Paul, Ste. 2250

Dallas, Texas 75201

kwiley@wileylawgroup.com

19. **Additional Parties and Deposits.** No Shareholder of the Company not an initial party to this Agreement may become a party hereto, nor may any Depositing Shareholder deposit additional Shares with the Trustees, without the written consent of the Trustees. The Trustees shall not give their written consent if to do so would result in a violation of the Securities Act of 1933 or any state securities law. If consent is given to a Shareholder not an initial party hereto, such Shareholder may become a party hereto by signing this Agreement or a counterpart hereof and delivering his or her Shares to the Trustees in the manner described in Paragraph 1 hereof, and thereupon the Trustees shall deliver to such Sh8lt'eholder a Trust

Certificate or Certificates representing the number of Shares so delivered by him or her. Such delivery shall be upon the same terms and conditions set forth in this Agreement and such Shareholder shall be bound by, and shall have the benefits of, all of the provisions of this Agreement.

20. **Termination.** This Agreement, unless otherwise previously terminated as hereinafter provided, or extended pursuant to Paragraph 21 hereof, shall terminate on the fifteenth anniversary of this Agreement. Notwithstanding the preceding sentence, the beneficial owners of more than fifty percent of the Trust Shares may at any time terminate this Agreement by resolution adopted at a meeting of the Depositing Shareholders called by anyone of them for that purpose on ten (10) days' notice in writing mailed to the Depositing Shareholders at their respective addresses as the same shall appear in the records of the Trustees. Upon termination, title and possession of Trust Share shall be delivered to the Depositing Shareholders

21. **Extension of Term.** This Agreement may be extended and renewed for an additional period of not more than ten years from the date of expiration of its original term. The Trustees shall call a meeting of the registered owners of the Trust Certificates to be held prior to. such date of expiration, for the purpose of voting upon the extension of this Agreement for an additional period of not more than ten years. Notice of such meeting shall be given to all Depositing Shareholders not later than thirty (30) days prior to the date of such meeting. At such meeting, the registered -holders of Trust Certificates, as of the date of the meeting or as of a record date established by the Trustees not more than ten days prior to the giving of notice of such meeting, shall be entitled to vote, and to cast the same number of votes as is the number of Trust Shares

represented by Trust Certificates registered in their respective names as of such date. At the meeting the Trustees shall preside and shall appoint the secretary of the meeting. If, at such meeting, registered owners of Trust Certificates representing a majority of the total number of Trust Shares shall vote in favor of a proposal to renew and extend this Agreement, then this Agreement shall be extended upon the same terms and conditions for such additional period of not more than ten years as such proposal shall set. At the meeting, the Depositing Shareholders may (by a majority vote of those present) adjourn the meeting from time to time, prior to the taking of a vote on the proposal to extend this Agreement, for the purpose of attempting to obtain a larger representation of Depositing Shareholders, provided that no such adjournment shall be beyond the date of expiration of the original term of this Agreement.

22. **Investment Representations.** Each Depositing Shareholder represents that he is acquiring his Trust Certificate(s) for his own account for investment and not with a view to the distribution or resale thereof; that he is aware that the Trust Certificates have not been registered pursuant to the Securities Act of 1933 or the Louisiana securities law; and that the Trustees are relying in part upon these investment representations to establish exemptions from securities registration under applicable federal and state securities laws. Each Depositing Shareholder understands and agrees that the Trustees may place a legend on the Trust Certificates to the effect that the Trust Certificates have not been registered under either Federal or state law, that they may not be offered, sold, transferred, or encumbered by the holder unless they have been first duly registered or unless the Trustees have received an opinion of counsel

satisfactory to them that any proposed offer, sale, transfer, or encumbrance will not violate any federal or state law or regulation and will not jeopardize or destroy any exemption from registration claimed by the Trustees in connection with the issuance of the Trust Certificate, and that no Depositing Shareholder has the right to cause or, unless specifically granted in writing, to compel such registration. Each Depositing Shareholder acknowledges that he understands that unregistered securities, such as the Trust Certificate, must be held indefinitely unless they are subsequently registered or unless an exemption from registration is available with respect to a proposed offer, sale, transfer, or encumbrance (collectively, a transfer11); that only the Trustees and the Company would be authorized to register the Trust Certificate; that the Depositing Shareholder cannot compel any such registration unless such right has been granted in writing; and that the availability of Rule 144 under the Securities Act of 1933 for the transfer of Trust Certificate and the underlying Trust Shares depends upon the existence of facts which do not now, and probably will never, exist and which neither the Trustees nor the Company is required to cause exist. Furthermore, in no event may a Trust Certificate be sold, transferred, or encumbered unless the holder of such Trust Certificate complies with the restrictions contained in the Stockholder Agreement dated October 7, 1997.

23. **Attorney.** Kevin S. Wiley, Sr. shall be the attorney for the Trust and Trustees.

24. **Amendment.** This Agreement may be modified, amended or altered only upon the affirmative vote of more than fifty percent of the beneficial owners of the Trust Shares pursuant to resolution adopted at a meeting of the Depositing Shareholders called by the Trustees for that purpose on ten (10) days' notice in writing mailed to

the Depositing Shareholders at their respective addressees as the same shall appear in the records of the Trustees.

25. **Qualified Voting Trust.** It is the intention of the undersigned that this Voting Trust Agreement complies with Internal Revenue Code§ 1361, and to the extent that any provision hereof is inconsistent with Internal Revenue Code § 1361 or the regulations thereunder, said provision or provisions shall be deemed amended in order to comply with such section and regulations.

26. **Severable.** The invalidity (a) of this Agreement as to any Depositing Shareholder, and/or (b) of any term, or provision hereof, shall not affect the validity hereof as to any other Depositing Shareholder or as to the remaining provisions hereof, unless such invalidity is such that it frustrates the essential purposes hereof.

27. **Heading.** Heading of paragraph are solely for convenience of reference, do not form part of this Agreement, are not intended to to limit the subject matter of any paragraph, and are to be disregarded in interpreting this Agreement. In construing this Agreement, unless otherwise clearly indicated, singular language shall include the plural and plural language shall include the singular, and masculine language shall also include the feminine and feminine language shall include the masculine.

28. **Governing Law.** This Agreement, and the Trust created hereby, shall be deemed Louisiana contracts and shall be governed for all purposes by Louisiana law.

**IN WITNESS WHEREOF**, the original Deposition Shareholders and the Trustees, indicated below, have executed this Agreement.

on the date first above written, and subsequent Depositing Shareholder on the respective dates indicated below, have executed this Agreement.

TRUSTEE:

| DEPOSITING SHAREHOLDERS | DATE | NUMBER OF SHARES | TRUSTEE CERTIFICATES |
|---|---|---|---|
| David Johns | | | |
| Jerry Rowell | | | |
| Tim Novak | | | |
| Leanne Elizabeth Johns Trust | | 200 | 1 |
| David Johns, Executor of the Estate | | | |

Of Ronald R. Johns, Sr.

200

2